904 P.2d 912

**STATE of Hawai'i, Respondent–Appellee,**

v.

**Billy HOLBRON, Petitioner–Appellant.**

**No. 15916.**

Supreme Court of Hawai'i.

Oct. 20, 1995.

Reconsideration Denied Nov. 8, 1995.

Theodore Y.H. Chinn, Deputy Public Defender, on the briefs, Honolulu, for petitioner-appellant Billy Holbron.

Caroline M. Mee, Deputy Prosecuting Attorney, on the briefs, Honolulu, for respondent-appellee State of Hawai'i.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

The matter before us confronts this court for the first time with the question whether, in combination, Hawai'i Revised Statutes (HRS) §§ 705–500 (1993) [1] and 707–702(1)(a) (1993) [2] create the offense of attempted manslaughter. Put differently, we consider whether, under the Hawai'i Penal Code (HPC) and within the context of the general criminal attempt liability delineated therein, it is possible for a defendant to be charged with or convicted of the offense of "attempted manslaughter" premised upon the defen-

---

1. HRS § 705–500 provides:

   **Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:
   (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
   (b) *Intentionally* engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct *intended* to culminate in the person's commission of the crime.

   (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person *intentionally* engages in conduct which is a substantial step in a course of conduct *intended or known* to cause such a result.

   (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

   (Underscoring added and bold face in original.) Only HRS §§ 705–500(1)(b) and 705–500(2) are relevant to this appeal.

2. HRS § 707–702(1)(a) provides that "[a] person commits the offense of manslaughter if ... he [or she] *recklessly* causes the death of another person[.]" (Emphasis added.)

dant attempting recklessly to cause the death of another person. In *State v. Tagaro*, 7 Haw.App. 291, 757 P.2d 1175, *cert. granted*, 69 Haw. 678, —— P.2d —— (1987), *cert. dismissed*, 70 Haw. 666, 796 P.2d 502 (1988), the Intermediate Court of Appeals (ICA) held, *inter alia*, that "a person charged with attempted murder, an intentional crime, may be found guilty of attempted manslaughter[,]" pursuant to HRS §§ 705–500 and 707–702(1)(a), "if the person acted intentionally or knowingly under mitigating circumstances that do not constitute [a] complete justification." *Tagaro*, 7 Haw.App. at 297, 757 P.2d at 1178.

The foregoing question is prompted by the petitioner-appellant Billy Holbron's appeal from the judgment, guilty conviction, and sentence of the First Circuit Court, filed on January 6, 1992, adjudging him guilty of attempted murder in the second degree, in violation of HRS §§ 705–500 and 707–701.5(1) (1993).[3] In his opening brief, Holbron urged, *inter alia*, that the circuit court erred in instructing the jury—over his objection—that "if it did not find [him] guilty of . . . attempted murder, it could find him guilty of the included offense of attempted reckless manslaughter" because, he argued, "[t]he offense of attempted reckless manslaughter is non-existent under [the HPC.]" The jury being "required to consider the non-existent included offense of attempted reckless manslaughter before it considered the . . . included offense of assault in the first degree" (which, in Holbron's words, the circuit court treated as "the second lesser included offense"), Holbron argued that the jury was wrongfully deprived of the opportunity fairly to consider whether he was guilty of the latter. Accordingly, Holbron asserted that the circuit court's harmful error entitled him to a new trial.

We assigned Holbron's appeal to the ICA, which affirmed the circuit court's judgment

of conviction in *State v. Holbron*, 10 Haw. App. 629, 862 P.2d 1079 (1993) (mem. op.) [hereinafter "ICA's decision"]. Noting that Holbron had argued "that *Tagaro* was wrongly decided because a person cannot attempt to cause the death of another person through the commission of a reckless act," the ICA expressly declined to retreat from its holding in *Tagaro*, which it characterized as follows: "[W]hen the defense of self-defense is raised in a prosecution for attempted murder, the [trial] court is required to instruct the jury that it may consider attempted manslaughter as a lesser included offense." ICA's decision at 2. Nevertheless, the ICA ruled that *Tagaro* did not support the attempted reckless manslaughter instruction given in the present case because, "[i]n *Tagaro*, the defendant alleged [that] he acted in self-defense," whereas "[h]ere, [Holbron] has made no such claim." *Id.* at 3. The ICA therefore held that "the challenged instruction to the jury was erroneous" but that "the erroneous instruction was harmless." *Id.* at 3–4.

We granted Holbron's application for a writ of certiorari to review the ICA's decision. Because, for the reasons set forth below, we hold as a matter of law that HRS §§ 705–500 and 707–702(1)(a) do not and cannot give rise to the offense of "attempted manslaughter" under any circumstances, we hereby overrule *Tagaro*. However, because we agree with Holbron that there is no offense of "attempted reckless manslaughter" under the HPC, we likewise agree with the ICA, albeit on different grounds, that the challenged jury instruction was erroneous. Moreover, on the record before us and for the reasons set forth below, we agree with the ICA that the erroneous instruction was harmless. Accordingly, we affirm the ICA's decision affirming the circuit court's judgment of conviction.[4]

---

3.  HRS § 707–701.5(1) provides that "[e]xcept as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person." HRS § 707–701 (1993), which is not material to this appeal, sets forth the elements of five forms of the offense of murder in the first degree.

4.  Holbron asserted a second point in his opening brief, namely, that the circuit court committed plain error in failing, *sua sponte*, to declare a mistrial when the deputy prosecuting attorney (DPA) allegedly committed prosecutorial misconduct during her rebuttal to defense counsel's closing argument. The ICA rejected the assertion, holding that the DPA's rebuttal did not deprive Holbron of his right to a fair trial. ICA's

## I. BACKGROUND

On May 3, 1990, the Office of the Prosecuting Attorney for the City and County of Honolulu filed a criminal complaint against Holbron in the First Circuit Court, charging him with attempted second degree murder as follows:

> On or about the 21st day of April, 1990, in the City and County of Honolulu, State of [Hawai'i], BILLY HOLBRON did intentionally engage in conduct which is a substantial step in a course of conduct intended or known to cause the death of Roxanne Benarao, thereby committing the offense of Attempted Murder in the Second Degree, in violation of Sections 705–500, 707–701.5(1) and 706–656[5] of the [Hawai'i] Revised Statutes.[6]

Holbron's trial began on November 4, 1991 and ended on November 15, 1991, with the return of the jury's guilty verdict. The ICA's decision accurately characterized the "operative facts" adduced at trial, as follows:

> [Benarao], [Holbron's] girl friend, arrived at [Holbron's] residence with a plate of food for him; [Benarao] placed the food in the icebox after discovering [Holbron] asleep; when [Holbron] awoke, [Benarao] took the food to him; [Holbron] indicated he did not like the taste of the food, so [Benarao] returned the food to the icebox and went into another room; shortly thereafter, [Holbron] entered the room where [Benarao] was, threw the plate of food at [Benarao's] head, and told her to go home; after [Benarao] gathered up her clothing, [Holbron] threw a radio at her; [Benarao] then entered the living room from where she saw [Holbron] walk in and out of the house several times; [Holbron] finally walked into the house with a gasoline container; [Holbron] asked [Benarao], "You ready to fucking die?"; [Holbron] threw some gasoline onto [Benarao]; [Holbron] then threw a lighted match at [Benarao], but the gasoline did not ignite; [Holbron] threw another lighted match at [Benarao] and the gasoline ignited; [Benarao] extinguished the flames but suffered severe burns; [Holbron] left the house and ran down the street; the house burned down.

> [Holbron] did not dispute any of the facts surrounding the event. His defense was that he had "potentially suffered a lot of trauma to the head, . . . and that he has recognized organic difficulties in the way his brain works and the way he functions in a day-to-day situation." One of [Holbron's] expert witnesses testified that [Holbron] suffered from damage to the right frontal lobe of the brain and had "significant difficulty with his impulse control." Another expert diagnosed [Holbron] as having "one, organic mental disorders not otherwise specified; and, two, antisocial personality disorder." A third expert diagnosed [Holbron] as having "number

decision at 7–8. Holbron has not sought review of this aspect of the ICA's decision in his application for a writ of certiorari, and, in any event, we agree with the ICA's decision in this respect.

5.  HRS § 706–656 (1993), entitled "Terms of imprisonment for first and second degree murder and attempted first and second degree murder," delineates the sentencing scheme relevant to those offenses. The statute was amended in 1993 after Holbron's conviction, see 1993 Haw. Sess.L.Act 271, § 2 at 472–73, although the amendment did not relate to any matter relevant to the sentence in this case. In any event, Holbron's sentence, as such, is not at issue in this appeal.

6.  The complaint correctly tracked the language of HRS §§ 705–500(2), see supra note 1, and 707–701.5(1), see supra note 3. Technically, HRS § 707–701.5(1) includes an "attendant circumstance," namely, that the death caused was to a "person." HRS § 707–700 (1993) defines "person" to mean "a human being who has been born and is alive." The complaint implicitly alleged that Holbron acted "with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of [second degree murder]," see HRS § 705–500(2), insofar as HRS § 707–701.5(1) specifies an intentional or knowing state of mind. See HRS § 702–205 (1993), which provides in relevant part that "[t]he elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as . . . [a]re specified by the definition of the offense[.]" (Emphasis added.) See also HRS § 702–207 (1993), which provides that "[w]hen the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears."

one, possible substance [induced] organic mental disorder; number two, substance abuse, methamphetamine."

ICA's decision at 4–5.

Holbron's defense theory, as ultimately argued to the jury by his counsel, was that his bizarre actions clearly indicated that he did not have the requisite state of mind to commit attempted murder. "Defense counsel maintained that the events that transpired could not have aroused [Holbron] to the point where he would have formed the specific intent to cause [Benarao's] death; if anything, [Holbron] had acted recklessly." *Id.* at 5.

During settlement of jury instructions, Holbron requested—and the circuit court agreed to give—instructions regarding the mitigating defense of attempted manslaughter by virtue of "extreme mental or emotional disturbance,"[7] as well as the included offenses of assault in the first degree,[8] assault in the second degree,[9] and reckless endangering in the first degree.[10]

The crux of this appeal, however, revolves around State's Supplemental Instruction No. 11, which sought to have the jury instructed regarding the "included offense" of "Attempted Manslaughter (Reckless conduct)" [hereinafter "the disputed instruction"].[11] As modified by the circuit court, the disputed instruction provided:

> A person commits the offense of Attempted Manslaughter if he intentionally engages in conduct, which under the circumstances as he believed them to be,

constituted a substantial step in a course of conduct to *recklessly* cause the death of another person.

There are two elements of Attempted Manslaughter, each of which must be proven by the prosecution beyond a reasonable doubt.

These two elements are:

1. The Defendant intentionally engaged in conduct; [and]

2. The conduct constituted a substantial step in a course of conduct to *recklessly* cause the death of Roxanne Benarao.

(Emphases added.) Defense counsel objected to the disputed instruction in the following colloquy with the circuit court:

> [DEFENSE COUNSEL:] Excuse me, Your Honor, on [the disputed instruction], I'm objecting to you giving this.
>
> . . . .
>
> THE COURT: Reckless conduct, manslaughter.
>
> [DEFENSE COUNSEL:] I don't believe there's any such animal in the law. There's absolutely no case law to support that proposition. . . .
>
> . . . .
>
> THE COURT: Okay. Well, your—your objection to [the disputed instruction] is noted.
>
> [DEFENSE COUNSEL:] Okay.
>
> THE COURT: You understand that I am going to give [the disputed instruction] over your objection.
>
> [DEFENSE COUNSEL:] Fine.

7. HRS § 707–702(2) (1993) provides:

> In a prosecution for murder in the first and second degrees it is a *defense,* which reduces the offense to manslaughter, that the defendant was, at the time he [or she] caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he [or she] believed them to be.
> (Emphasis added.)

8. HRS § 707–710(1) (1993) provides that "[a] person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person."

9. HRS § 707–711(1)(b) (1993) provides that "[a] person commits the offense of assault in the second degree if . . . [t]he person recklessly causes serious bodily injury to another person[.]"

10. HRS § 707–713(1) (1993) provides in relevant part that "[a] person commits the offense of reckless endangering in the first degree if the person employs widely dangerous means in a manner which recklessly places another person in danger of death or serious bodily injury[.]"

11. Significantly, when the circuit court inquired whether Holbron was seeking such an instruction, defense counsel replied, "My own belief, in looking at all the case law that I've been able to go through, [is] that you cannot have an attempt at a reckless crime."

. . . .

THE COURT: Okay. All right. The— your objection to [the disputed instruction] is noted for the record.

[DEFENSE COUNSEL:] Thank you, sir.

At the conclusion of the parties' final arguments, the circuit court instructed the jury on the law of the case, including instructions regarding the general nature of attempt liability, the elements of attempted second degree murder, the mitigating defense of manslaughter by virtue of "extreme mental or emotional disturbance," the elements of the included offenses requested by Holbron, and the disputed instruction regarding "Attempted Manslaughter (Reckless conduct)."

The jury deliberated for twenty-nine minutes before returning a guilty verdict as to the charged offense of attempted second degree murder. After a subsequent sentencing hearing, the circuit court sentenced Holbron to a term of life imprisonment with the possibility of parole, pursuant to HRS § 706–656(2) (1993), and Holbron filed a timely appeal.

## II. STANDARDS OF REVIEW

■ " 'When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, *erroneous,* inconsistent, or misleading.' " *State v. Kinnane,* 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (quoting *State v. Kelekolio,* 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993) (citations omitted)) (some emphasis added and some

deleted). *See also State v. Hoey,* 77 Hawai'i 17, 38, 881 P.2d 504, 525 (1994).

■ " '[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.' " *State v. Pinero,* 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) [hereinafter *Pinero I* ] (quoting *Turner v. Willis,* 59 Haw. 319, 326, 582 P.2d 710, 715 (1978)).

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. *See Yates v. Evatt,* 500 U.S. 391, 402–03, 111 S.Ct. 1884, 1892–1893, 114 L.Ed.2d 432 (1991); *see also State v. Suka,* 79 Hawai'i 293, 300, 901 P.2d 1272, 1279 (App.1995) ("In applying the harmless beyond a reasonable doubt standard the court is required to examine the record and determine 'whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction.' ") (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967)).[12]

12. In *Suka,* slip op. at 12, the ICA acknowledged that this court has viewed certain rights protected by the Hawai'i Constitution to be "so basic to a fair trial that [their] contravention can never be deemed harmless," citing *State v. Bowe,* 77 Hawai'i 51, 881 P.2d 538 (1994) (holding that use of coerced confession in a criminal trial would be fundamentally unfair), as an example. Likewise, the ICA correctly recognized that the necessity of reversal under Hawai'i Rules of Penal Procedure (HRPP) Rule 52(a) is determined by the application of the "harmless beyond a reasonable doubt" standard of review. *Suka,* 79 Hawai'i at 300, 901 P.2d at 1279. *See State v. Furutani,* 76 Hawai'i 172, 181, 185, 873 P.2d 51, 60, 64 (1994); *State v. Valera,* 74 Haw. 424, 440, 848 P.2d 376, 383, *reconsideration denied,* 74 Haw. 650, 853 P.2d 542 (1993); *State v. Nakoa,* 72 Haw. 360, 370–71, 817 P.2d 1060, 1066 (1991); *State v. Williamson,* 72 Haw. 97, 102, 807 P.2d 593, 596 (1991); *State v. Marsh,* 68 Haw. 659, 661, 728 P.2d 1301, 1302–03 (1986); *State v. Melear,* 63 Haw. 488, 496, 630 P.2d 619, 626 (1981); *State v. Amorin,* 58 Haw. 623, 629, 574 P.2d 895, 899 (1978). On the other hand, the *Suka* court seemed to perceive a class of errors in criminal cases "not of constitutional magnitude which may be deemed harmless unless the violation substantially affected the verdict or outcome of the case." *Id.* 79 Hawai'i at 298, 901 P.2d at 1277. To the extent that this language in *Suka* implies a standard of review under HRPP

III. *THERE CAN BE NO ATTEMPT TO COMMIT INVOLUNTARY MAN-SLAUGHTER, AND, THUS, UNDER THE HAWAI'I PENAL CODE, THERE IS NO OFFENSE OF AT-TEMPTED MANSLAUGHTER BY VIRTUE OF ATTEMPTING RECK-LESSLY TO CAUSE THE DEATH OF ANOTHER PERSON; ACCORDING-LY THE DISPUTED INSTRUCTION WAS ERRONEOUS AND STATE V. TAGARO WAS WRONGLY DECIDED.*

### A. Overview—Relevant Case Law And Other Authority

Although this court has recognized that, for purposes of HRS § 705–500, *see supra* note 1, "[i]ntent is an essential element of the crime of criminal attempt," *State v. Faulkner,* 61 Haw. 177, 178, 599 P.2d 285, 286 (1979); *see also State v. Reiger,* 64 Haw. 510, 512, 644 P.2d 959, 962 (1982), the case law in this jurisdiction directly addressing the subject of general attempt liability is sparse.[13] However, the relationship between the intentional and reckless states of mind, on the one hand, and criminal attempt liability, on the other, as well as the conceptual possibility of attempted manslaughter, have been thoroughly examined in other jurisdictions and the scholarly literature.

### 1. Blackstone's commentary on the law of voluntary and involuntary manslaughter

The common law of England provides an apt starting point. Although first published in 1769, Blackstone's commentary on the nature of manslaughter remains, as will become clear, remarkably "modern" and is all the more noteworthy because it does not contemplate the possibility of attempt liability:

MANSLAUGHTER is ... defined [as] the unlawful killing of another, without malice either express or implied: which may be either voluntarily,[14] upon a sudden heat; or involuntarily,[15] but in the commission of some unlawful act....

As to the first, or *voluntary* branch: if upon a sudden quarrel two persons fight, and one of them kills the other, this is manslaughter: and so it is, if they upon such occasion go out and fight in a field; for this is one continued act of passion: and the law pays that regard to human frailty, as not to put a hasty and a deliberate act upon the same footing with regard to guilt. So also if a man be greatly provoked, as by pulling his nose, or other great indignity, and immediately kills the aggressor, though this is not excusable *se defendendo* [*i.e.*, self-defense], since there is no absolute necessity for doing it to preserve himself; yet neither is it murder, for there is no previous malice; but it is manslaughter. But in this, and in every other case of homicide upon provocation, if there be a sufficient cooling-time for passion to subside and reason to interpose, and the person so provoked afterwards kills the other, this is deliberate revenge and not heat of blood, and accordingly amounts to murder.... Manslaughter therefore on a sudden provocation differs from excusable homicide *se defendendo* in

52(a) other than "harmless beyond a reasonable doubt," we expressly disapprove and overrule it.

**13.** As an example of this court's application of HRS § 705–500 to substantive criminal offenses, *see State v. Kinnane,* 79 Hawai'i 46, 897 P.2d 973 (1995). The ICA's analysis of criminal attempt liability in *Tagaro, supra,* is discussed extensively *infra* in section III.C.4. of this opinion. *See also State v. Nizam,* 7 Haw.App. 402, 409–10, 771 P.2d 899, 904, *reconsideration denied,* 7 Haw. App. 668, 807 P.2d 54, *cert. denied,* 70 Haw. 666, 796 P.2d 502 (1989).

**14.** "We define voluntary manslaughter as an *intentional* homicide, done in a sudden heat of passion, caused by adequate provocation, before there has been a reasonable opportunity for the

passion to cool." *Cox v. State,* 311 Md. 326, 534 A.2d 1333, 1335 (1988) (emphasis in original and citations omitted). *See also Black's Law Dictionary* 964 (6th ed. 1990) (defining "voluntary manslaughter" to mean manslaughter "committed voluntarily upon a sudden heat of the passions; as if, upon a sudden quarrel, two persons fight, and one of them kills the other").

·15. "Involuntary manslaughter, on the other hand, is defined as the *unintentional* killing, done without malice, by doing some unlawful act endangering life...." *Cox,* 534 A.2d at 1335–36 (emphasis in original and citations omitted). *See also Black's Law Dictionary* 964 (6th ed. 1990) (defining "involuntary manslaughter" to exist "where a person in committing an unlawful act ... unguardedly or undesignedly kills another").

this: that in one case there is an apparent necessity, for self-preservation, to kill the aggressor; in the other no necessity at all, being only a sudden act of revenge.

The second branch, or *involuntary* manslaughter ... always happens ... in consequence of an unlawful [act]. As if two persons play at sword and buckler, unless by the king's command, and one of them kills the other: this is manslaughter, because the original act was unlawful; but it is not murder, for the one had no intent to do the other any personal mischief....

4 W. Blackstone, *Commentaries on The Laws of England* 191–92 (The Legal Classics Library 1983 spec. ed.) (emphases in original) (footnotes omitted) [hereinafter 4 W. Blackstone, *Commentaries*]. We thus inherit, with minimal modifications, several enduring principles regarding manslaughter from the English common law: (1) manslaughter may be either "voluntary" or "involuntary," but not both at the same time; (2) voluntary manslaughter arises out of a purposeful but "hasty" act that would constitute murder but for the absence of "malice" and the presence of "provocation," "passion," or "heat of blood," which is unsubsided by "sufficient cooling-time"; (3) involuntary manslaughter arises out of an unjustified but unintentional act of homicide; (4) the justifiable use of deadly force in self-defense may excuse an act of homicide that would otherwise amount to murder or manslaughter; and (5) the use of deadly force purportedly in self-defense is either justifiable or it is not, and, if it is not, neither murder nor manslaughter is excused.

### 2. The "problem" of attempted manslaughter

One of the most frequently cited scholarly dissertations on the application of attempt liability to the legal construct of manslaughter appeared in 1957 in the Harvard Law Review:

... It has been said that, as a general matter, either intention or recklessness will be sufficient *mens rea* to ground liability for crimes at common law; but that,

where the charge is not for the complete crime, but for an attempt to commit it, only intention will suffice and mere recklessness is not enough....

. . . .

The conception of attempt seems necessarily to involve the notion of an intended consequence. Thus the word "attempt" is defined in the *Shorter Oxford English Dictionary* as "a putting forth of effort to accomplish what is uncertain or difficult." When a man attempts to do something he is "endeavoring" or "trying" to do it. All these ways of describing an attempt seem to require a desired, or at least an intended, consequence. Recklessness ... [is] incompatible with desire or intention. Where, therefore, in a crime which by definition may be committed recklessly ... but not intentionally [and] the recklessness ... relates not to a pure circumstance but to a consequence, it is impossible to conceive of an attempt. Thus there can be no attempt to commit involuntary manslaughter. The consequence involved in that crime is the death of the victim and an act done with intent to achieve this, if an attempt at all, is attempted murder. It is of the essence of involuntary manslaughter that the consequence be produced ... recklessly ..., but not intentionally.

An attempt to commit voluntary manslaughter, on the other hand, may theoretically be possible. D, acting under such provocation as would reduce murder to manslaughter, strikes at P with a hatchet with intent to kill him but misses. Assuming that the doctrine of provocation applies on a charge of attempted murder, D would appear to be guilty of attempted manslaughter. This variety of manslaughter may be committed when the consequence involved in the complete crime is intended.

J.C. Smith, *Two Problems in Criminal Attempts,* 70 Harv.L.Rev. 422, 429, 434 (1957) (footnotes omitted) [hereinafter *Two Problems*].[16]

---

**16.** As we demonstrate *infra* in section III.B. of this opinion, HRS §§ 705–500 and 707–702 are—with one minor variation regarding the requisite state of mind as to the result of the actor's conduct (when causing a particular result is an element of an offense), *see* HRS § 705–500(2)— in complete conformity with the conceptual framework set out in *Two Problems.*

Thus, *Two Problems* teaches that: (1) by its very nature, a criminal attempt presupposes a desired or "intended consequence"; (2) recklessness and "desire or intention" are mutually exclusive; (3) when the elements of a criminal offense are so defined that the "consequence" of the actor's conduct is produced recklessly, "it is impossible to conceive of an attempt"; (4) it is the essence of involuntary manslaughter "that the consequence be produced ... recklessly"; (5) therefore, "there can be no attempt to commit involuntary manslaughter"; but, (6) "when the consequence involved in the complete crime is intended," there can be attempted voluntary manslaughter precipitated through "provocation."

### 3. *The law of attempted manslaughter, both involuntary and voluntary, in other jurisdictions*

Barring a few distinguishable exceptions (which are discussed *infra* at notes 17 and 18), it would appear that virtually the entire universe of American case law is in accord with *Two Problems*.

### a. *Attempted involuntary manslaughter*

Our research efforts have failed to discover a single jurisdiction that has recognized the possibility of attempted involuntary manslaughter. On the other hand, the cases holding that attempted involuntary manslaughter is a statutory impossibility are legion.

One noteworthy example is *State v. Almeda*, 189 Conn. 303, 455 A.2d 1326 (1983). In *Almeda*, the defendant, having been charged by indictment, *inter alia*, with attempted murder, was convicted by a jury, *inter alia*, of the "included offense" of attempted manslaughter in the first degree. On the defendant's motion, the trial court ruled that the form of attempted manslaughter of which the defendant was convicted did not exist under Connecticut law. The trial court vacated the jury's guilty verdict, and the prosecution appealed. The Connecticut Supreme Court agreed with the trial court, reasoning as follows:

> It is plain from a reading of [the Connecticut criminal attempt statute, which is identical in all material respects to HRS § 705–500(1),] that the intent required for attempt liability is the intent required for the commission of the substantive crime. The criminal result must be the conscious object of the actor's conduct. A person is guilty of manslaughter in violation of [the applicable statute] when "[w]ith [the] intent to ˌcause serious physical injury to another person, he causes the death of such person or of a third person...." [Connecticut law] defines "serious physical injury" as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health, or serious loss or impairment of the function of any bodily organ...." Thus, the requisite intent for manslaughter under [the applicable statute] is the intent to cause serious physical injury rather that the "intent to cause the death of another person" required for the crime of murder....
>
> Manslaughter committed without an intent tˌo cause the death of another is analogous to the concept of involuntary manslaughter.... No intent to cause death is required.
>
> The illogic of attempted involuntary manslaughter is easily demonstrated. Manslaughter, as herein involved, requires that an individual having the intent to cause serious physical injury to another person causes the death of such person. Involuntary manslaughter is a homicide unintentionally caused. Attempt liability requires that the defendant entertain the intent required for the substantive crime. Unless death results there can be no crime of involuntary manslaughter. Thus, the crime of attempted involuntary manslaughter requires a logical impossibility, namely, that the actor in his attempt intend that an unintended death result. Such an anomaly the legislature could scarcely have intended. Accordingly, we hold that attempted manslaughter in violation of [the applicable statute] is not a crime cognizable under our law.

*Id.* at 1328–30 (citations and footnotes omitted) (some brackets in original and some added).

Similarly, in *State v. Collins,* 257 Kan. 408, 893 P.2d 217 (1995), the defendant (Collins) was convicted of attempted first degree murder, and he appealed the trial court's failure to instruct the jury on the "included" offense of attempted involuntary manslaughter, arguing, *inter alia,* that his assertion of self-defense entitled him to the instruction. The Kansas Supreme Court disagreed with Collins, affirmed the trial court, and ruled as follows:

> Collins confuses the issue by arguing that he intentionally acted in self-defense but that he did not intend to use excessive force in defending himself. Collins' argument improperly assigns the object of his attempt as the use of unnecessary force rather than his act of self-defense.

> Contrary to Collins' assertion, the attempt statute requires that a person have the specific intent to commit the crime charged. Regardless of whether Collins intentionally acted in self-defense, he could not have intended to commit an unintentional killing, or involuntary manslaughter. Had the jury concluded that Collins was justified in using self-defense, but that his use of force exceeded that necessary to defend himself against [the victim's] imminent use of unlawful force, it would have found Collins guilty of [assault], as instructed.

> The language of the attempt statute requires that a person possess the specific intent to commit the crime. Therefore, to establish the crime of attempted involuntary manslaughter the person would be required to specifically intend to commit an unintentional crime. This is a logical impossibility. Although it is possible for an actor to use excessive force in self-defense, the actor cannot unintentionally act in self-defense. We conclude that Kan-

sas does not recognize the crime of attempted involuntary manslaughter.

*Id.* at 223 (citation omitted).[17]

Likewise, in *Gonzales v. State,* 532 S.W.2d 343 (Tex.Crim.App.1976), the defendant was convicted of attempted murder and appealed, *inter alia,* the trial court's refusal to give an included offense instruction regarding "attempted involuntary manslaughter." The Texas Court of Criminal Appeals affirmed, ruling as follows:

> [T]he appellant contends that the trial court erred in not submitting a charge on "attempted involuntary manslaughter." The jury was instructed as to the law of attempted murder and aggravated assault.

> The statute defines involuntary manslaughter as a reckless act. For an offense to amount to a criminal attempt there must be a specific intent to commit the offense. . . . Attempted involuntary manslaughter would be a contradiction in terms under the new penal code. Involuntary manslaughter negates any specific intent to kill. One cannot intend to "involuntarily" kill another. We hold that the court did not err in refusing to submit the charge on "attempted involuntary manslaughter." There is no offense of "attempted involuntary manslaughter."

*Id.* at 345 (citations omitted).

The decisions in accord with *Almeda, Collins,* and *Gonzales* include: *Stennet v. State,* 564 So.2d 95, 96–97 (Ala.Crim.App.1990) (in face of manslaughter statute identical to HRS § 707–702(1)(a) and citing *Two Problems,* holding that "[t]here is no such offense as attempted manslaughter in Alabama since 'intent' and 'recklessness' are incompatible terms"); *State v. Barnes,* 162 Ariz. 92, 93, 781 P.2d 69, 70 (Ariz.Ct.App.1989); *People v. Brito,* 232 Cal.App.3d 316, 283 Cal.Rptr. 441, 443–44 (1991); *People v. Hernandez,* 44 Colo.

---

17. *Cf. State v. Camacho,* 176 Wis.2d 860, 501 N.W.2d 380 (1993), which recognized "the crime of attempted imperfect self-defense manslaughter." *Id.* at 389. *Camacho* would appear to be an anomaly, inasmuch as Wisconsin has enacted a manslaughter statute that provides in relevant part:

Whoever causes the death of another human being under any of the following circumstances is guilty of [manslaughter]:

. . . .

(2) Unnecessarily, *in the exercise of his privilege of self-defense* or defense of others or the privilege to terminate the commission of a felony[.]

*Id.* at 383–84 (emphasis in original). Hawai'i has enacted no such statute.

App. 161, 614 P.2d 900, 901 (1980) (citing *Two Problems* and holding that offense of "attempted criminally negligent homicide" was nonexistent); *Taylor v. State,* 444 So.2d 931, 934 (Fla.1983); *Vandeventer v. State,* 459 N.E.2d 1221, 1222 (Ind.Ct.App.1984); *Goodwin v. State,* 439 N.E.2d 595, 598 (Ind. 1982); *Anthony v. State,* 274 Ind. 206, 409 N.E.2d 632, 636 (1980) ("[T]here can be no crime of attempted reckless homicide."); *State v. Huff,* 469 A.2d 1251, 1253 (Me.1984); *State v. Howard,* 405 A.2d 206, 212 (Me. 1979); *Cox v. State,* 311 Md. 326, 534 A.2d 1333, 1336 (1988); *Commonwealth v. Hebert,* 373 Mass. 535, 368 N.E.2d 1204, 1206 (1977) ("[T]here is no such crime as attempted involuntary manslaughter. An attempt to commit a crime necessarily involves an intent to commit that crime. Involuntary manslaughter is homicide unintentionally caused. Hence, an attempt to commit involuntary manslaughter is logically impossible." (Citations omitted.)); *People v. Hall,* 174 Mich. App. 686, 436 N.W.2d 446, 448 (1989) ("[T]here can be no conviction of attempted manslaughter based on defendant's . . . reckless behavior[.]"); *People v. Genes,* 58 Mich. App. 108, 227 N.W.2d 241, 242 (1975) ("[T]here can be no such thing as attempted involuntary manslaughter[.]"); *State v. Smith,* 3 Neb.App. 564, 529 N.W.2d 116, 123 (1995) ("[A]ttempted involuntary manslaughter does not and cannot exist under current Nebraska law. This court recognized that a person cannot intentionally take a substantial step toward the commission of a crime when that crime is an unintentional crime." (In-

ternal quotation marks and brackets omitted.)); *State v. Johnson,* 103 N.M. 364, 707 P.2d 1174, 1178–79 (N.M.Ct.App.1985) (holding that crime of attempted "depraved mind" murder—analogous to attempted "reckless" manslaughter as described in HRS § 707–702(1)(a)—does not exist); *People v. Martinez,* 81 N.Y.2d 810, 595 N.Y.S.2d 376, 377, 611 N.E.2d 277 (1993); *People v. McDavis,* 97 A.D.2d 302, 469 N.Y.S.2d 508, 510 (1983) ("[T]here can be no attempt to commit a crime that does not involve a specific intent, such as manslaughter in the second degree, a crime predicated upon a reckless act."); *People v. Jackson,* 49 A.D.2d 680, 370 N.Y.S.2d 739, 740 (1975) (same proposition); *People v. Foster,* 19 N.Y.2d 150, 278 N.Y.S.2d 603, 605, 225 N.E.2d 200 (1967); *State v. Carson,* 292 Or. 451, 640 P.2d 586, 593 (1982); *Commonwealth v. Griffin,* 310 Pa.Super. 39, 456 A.2d 171, 177 (1983); *Hull v. State,* 553 S.W.2d 90, 94 (Tenn.Crim.App.1977); and *State v. Norman,* 580 P.2d 237, 239–40 (Utah 1978) ("[I]f there was reckless conduct done with *intent* to commit manslaughter, it would be attempted murder and not merely attempted manslaughter. We hold that there cannot be an attempt to commit manslaughter under [the statute]." (Emphasis in original.)).

### b. *Attempted voluntary manslaughter*

On the other hand, the overwhelming weight of the case law in other jurisdictions recognizes the statutory existence of attempted voluntary manslaughter.[18] For ex-

---

**18.** Four jurisdictions—Massachusetts, Illinois, Nebraska, and Nevada—appear to have declined to recognize the statutory existence of attempted voluntary manslaughter, although the reasons they advance for doing so would seem to be inapposite to the relationship between HRS §§ 705–500 and 707–702(2).

In *Commonwealth v. Hebert,* 373 Mass. 535, 368 N.E.2d 1204 (1977), the Massachusetts Supreme Judicial Court conceded that "an attempt to commit voluntary manslaughter is logically possible" inasmuch as "[a]n intent to kill may exist when one intends only such killing as amounts to manslaughter." *Id.* at 1206 (citation and internal quotation marks omitted). "Notwithstanding the logical possibility," the *Hebert* court concluded that "recognition of a crime of attempted voluntary manslaughter would serve [no] useful purpose" because it was "unable to

hypothesize a case which might constitute attempted voluntary manslaughter which would not also constitute assault with intent to kill," thus generating needless confusion. *Id.* at 1206–07. We note that the HPC does not include the offense of "assault with intent to kill."

In *People v. Reagan,* 99 Ill.2d 238, 75 Ill.Dec. 701, 457 N.E.2d 1260 (1983), the Illinois Supreme Court held that there was no crime of attempted voluntary manslaughter "based on an imperfect self-defense," *id.,* 75 Ill.Dec. at 702, 457 N.E.2d at 1261, because the attempt statute required "that there be an intent to kill without lawful justification," and "it is impossible to intend an unreasonable belief" that killing is justified. *Id.,* 75 Ill.Dec. at 702–703, 457 N.E.2d at 1261–62. Thus, the statute in question was apparently analogous to that before the court in *State v. Camacho, supra* note 17, and the Illinois Supreme Court would seem to have anticipated

ample, in *Almeda, supra,* the Connecticut Supreme Court made the following observations regarding the section of the state's manslaughter statute deemed to be "analogous to the concept of voluntary manslaughter":

> Manslaughter under [the applicable statute] is an intentional killing mitigated by circumstances evincing extreme emotional disturbance. Thus, the holding herein, that attempted manslaughter in violation of [the involuntary manslaughter statute] is not a crime, has no bearing on the offense of attempted manslaughter in violation of [the applicable statute], as that crime requires an intent to cause the death of another person....

*Almeda,* 455 A.2d at 1329 & n. 5. *See also Norman,* 580 P.2d at 240, in which the Utah Supreme Court held that a guilty verdict involving criminal attempt liability under the state's voluntary manslaughter statute could be sustained because "[t]here, the killing may be intentional but due to [extreme] mental or emotional disturbance [for which there is a reasonable explanation or excuse] on the part of a defendant, he does not possess the element of malice aforethought to justify a verdict of guilty of murder."

The decisions in accord with *Almeda* and *Norman* include: *Barnes,* 162 Ariz. at 93, 781 P.2d at 70 (where evidence showed that defendant intended to shoot victim and did shoot victim in "a sudden quarrel or in the heat of passion," but the victim lived, Arizona Court of Appeals held that "the offense committed was attempted heat of passion or sudden quarrel manslaughter" and defendant "was properly convicted of a cognizable crime"); *People v. Lewis,* 21 Cal.App.4th 243, 25 Cal.Rptr.2d 827 (1993); *People v. Van Ronk,* 171 Cal.App.3d 818, 217 Cal.Rptr. 581 (1985) (holding that attempted voluntary manslaughter is legally possible because defendant can intend to kill, but with mitigating circumstances); *Taylor,* 444 So.2d at 933–34; *Rodriguez v. State,* 443 So.2d 286, 288–89, 292 (Fla.Dist.Ct.App.1983); *Goodwin,* 439 N.E.2d at 599; *Anthony,* 409 N.E.2d at 636; *State v. Harper,* 17 So.2d 260, 261 (La.1944); *Cox,* 534 A.2d at 1335–37; *Hall,* 436 N.W.2d at 448; *Genes,* 227 N.W.2d at 242–43; *State v. Koop,* 380 N.W.2d 493, 494–95 (Minn.1986) (recognizing offense of attempted "heat-of-passion" manslaughter); *Carson,* 640 P.2d at 591 (holding that evidence of extreme emotional disturbance was sufficient to justify giving prosecution's instruction on attempted manslaughter in attempted murder prosecution); *Commonwealth v. Garner,* 314 Pa.Super. 566, 461 A.2d 302 (1983); *Ex parte Buggs,* 644 S.W.2d 748 (Tex.Crim.App.1983) (holding, in attempted murder prosecution, that defendant could be convicted of attempted voluntary manslaughter where charged offense arose out of murder statute that prohibited "intentionally or knowingly caus[ing] the death of an individual" and voluntary manslaughter was defined as the same as murder, except that defendant caused the death "under the immediate influence of sudden passion arising from an adequate cause"); *State v. Clayton,* 658 P.2d 624, 625–26 (Utah 1983) (acknowledging that, under state law, defendant charged with attempted murder could, if supported by the evidence, be convicted of attempted manslaughter by virtue of being "under the influence of extreme mental or emotional disturbance for

the position regarding attempted "imperfect self-defense" manslaughter that the Kansas Supreme Court later took in *State v. Collins, supra.* As we have noted *supra* at note 17, Hawai'i has not codified the offense of "imperfect self-defense" manslaughter.

In *State v. Smith,* 3 Neb.App. 564, 529 N.W.2d 116 (1995), the Nebraska Court of Appeals held that "[b]ecause one cannot intend to commit the *unintentional* crime of attempted voluntary manslaughter, it does not exist as a crime under Nebraska law." *Id.* at 124 (emphasis added). The manslaughter offense denominated "voluntary" by the Nebraska legislature being "unintentional" in character, the holding in *Smith* may not be aberrational at all, insofar as the statute would seem to fit more comfortably into the traditional paradigm of "involuntary" manslaughter. *See* 4 W. Blackstone, *Commentaries* 191–92; *Two Problems* at 434; *Cox,* 534 A.2d at 1335–36; *Almeda,* 455 A.2d at 1329.

Finally, in *Curry v. State,* 106 Nev. 317, 792 P.2d 396 (1990), the Nevada Supreme Court held that "attempted voluntary manslaughter is not a crime in Nevada." *Id.* at 397. The voluntary manslaughter statute at issue has no counterpart in the HPC, although it appears to be a form of "heat of passion" manslaughter. Adopting the broadest possible view of the impossibility of attempted voluntary manslaughter, the *Curry* court explained that a person cannot specifically intend to attempt to commit a general intent offense. *Id.*

which there is a reasonable explanation or excuse"); and *State v. Duff,* 150 Vt. 329, 554 A.2d 214 (1988).

### B. *The Hawai'i Penal Code And Relevant Hawai'i Case Law*

With the foregoing scholarly literature and case law from other jurisdictions in mind, we now analyze the HPC and this court's precedent in order to answer the question whether the offense of attempted "reckless manslaughter" is cognizable under Hawai'i law.

#### 1. *General principles*

We noted in *State v. Chung,* 75 Haw. 398, 411, 862 P.2d 1063, 1070 (1993), that:

> "HRS § 701–114(1)(a) and (b) [ (1993) ] requires proof beyond a reasonable doubt of each element of the offense, as well as 'the state of mind *required* to establish each element of the offense.' " *State v. Pinero,* 75 Haw. 282, 300, 859 P.2d 1369, 1378 (1993) [hereinafter *Pinero II* ] [ (emphasis added) ]. Moreover, HRS § 702–204 [ (1993) ] provides in relevant part that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies with respect to each element of the offense." Finally, HRS § 702–207 [ (1993) ] provides that "[when] the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears."

> *See also In re [John] Doe, Born on January 5, 1976,* 76 Hawai'i [85,] 92, 869 P.2d [1304,] 1311 [ (1994) ]. In addition, "[pursuant] to HRS § 702–205 [ (1993) ], the requisite state of mind applies to such conduct, attendant circumstances, and results of conduct as are specified by the definition of the offense." *Chung,* 75 Haw. at 411–12, n. 8, 862 P.2d at 1071 n. 8.

*State v. Kupau,* 76 Hawai'i 387, 390–91, 879 P.2d 492, 495–96 (1994) (footnote and some brackets omitted). *See also State v.*

*Gaylord,* 78 Hawai'i 127, 136–37, 890 P.2d 1167, 1176–77 (1995).

*State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995) (some brackets added and some in original). *See also State v. Kinnane,* 79 Hawai'i 46, 52–53, 897 P.2d 973, 979–80 (1995).

The pertinent intentional, knowing, and reckless states of mind are defined in HRS § 702–206 (1993), which provides in relevant part:

**Definitions of states of mind.** (1) "Intentionally."

(a) A person acts intentionally with respect to his [or her] conduct when it is his [or her] conscious object to engage in such conduct.

(b) A person acts intentionally with respect to attendant circumstances when he [or she] is aware of the existence of such circumstances or believes or hopes that they exist.

(c) A person acts intentionally with respect to the result of his [or her] conduct when it is his [or her] conscious object to cause such a result.

(2) "Knowingly."

(a) A person acts knowingly with respect to his [or her] conduct when he [or she] is aware that his [or her] conduct is of that nature.

(b) A person acts knowingly with respect to attendant circumstances when he [or she] is aware that such circumstances exist.

(c) A person acts knowingly with respect to a result of his [or her] conduct when he [or she] is aware that it is practically certain that his [or her] conduct will cause such a result.

(3) "Recklessly."

(a) A person acts recklessly with respect to his [or her] conduct when he [or she] consciously disregards a substantial and unjustifiable risk that the person's conduct is of the specified nature.

(b) A person acts recklessly with respect to attendant circumstances when he [or she] consciously disregards a

substantial and unjustifiable risk that such circumstances exist.

(c) A person acts recklessly with respect to a result of his [or her] conduct when he [or she] consciously disregards a substantial and unjustifiable risk that his [or her] conduct will cause such a result.

(d) A risk is substantial and unjustifiable within the meaning of this subsection if, considering the nature and purpose of the person's conduct and the circumstances known to him [or her], the disregard of the risk involves a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation.

As a final preliminary matter, we note that HRS § 702–208 (1993) provides in relevant part that "[w]hen the law provides that recklessness is sufficient to establish an element of an offense, that element also is established if, with respect thereto, a person acts intentionally or knowingly." "Since intent, knowledge, [and] recklessness ... are in a descending order of culpability, this section establishes that it is only necessary to articulate the minimal basis of liability for the more serious bases to be implied. The proposition is essentially axiomatic." Commentary on HRS § 702–208 (internal quotation marks and footnote omitted). It is equally axiomatic, however, in light of HRS §§ 701–114(1), 702–204, and 702–205, .that a *reckless* state of mind, "required" and "specified" by the statutory language of an offense, cannot be transformed into a "required" or "specified" *intentional* or *knowing* state of mind merely because the latter, through overkill, proves the former. Were this not the case,

then, for example, second degree murder in violation of HRS § 707–701.5 (*i.e.,* intentionally or knowingly causing the death of another person), *see supra* note 3, and manslaughter in violation of HRS § 707–702(1)(a) (*i.e.,* recklessly causing the death of another person), *see supra* note 2, would amount to the same offense.[19]

## 2. *General criminal attempt liability*

General criminal attempt liability is circumscribed in the HPC by HRS § 707–500. *See supra* note 1. The commentary on HRS § 705–500 sets forth the conceptual underpinnings of the "nature of intent in attempt cases" in relevant part as follows: [20]

**The nature of intent in attempt cases.** Subsection (1) recognizes penal liability where the defendant's conduct is intentional and consummation of the crime is prevented either by his erroneous appraisal of attendant (i.e., those specified by the definition of the offense) or other circumstances or by some intervening factor following a substantial step in a course of conduct planned to culminate in the commission of the crime. It is easy to recognize penal liability in such cases, notwithstanding the absence of a substantive offense, because *the defendant's intent* —his conscious object—*is commission of a crime.*[21] His disposition toward criminal activity thus established, attempt liability is imposed, under subsection (1)(a), if the defendant's conduct has advanced so far toward the criminal objective as to constitute the crime had the attendant circumstances been as he believed them to be, or under subsection (1)(b), if his conduct has advanced so far toward the criminal objective as to constitute a substantial step in a

---

**19.** By way of further example, the same could be said of assault in the first degree in violation of HRS § 707–710 (1993) (*i.e.,* intentionally or knowingly causing serious bodily injury to another person) and assault in the second degree in violation of HRS § 707–711(1)(b) (1993) (*i.e.,* recklessly causing serious bodily injury to another person).

**20.** [W]e look to the commentary to the Hawai'i Penal Code (HPC), HRS Title 37, "as an aid in understanding" [its] terms.... *See* HRS § 701–105 [ (1993) ] ("The commentary accompanying ... [the Hawai'i Penal] Code ... may be used as an aid in understanding [its]

provisions ..., but not as evidence of legislative intent"); *cf. State v. Alo,* 57 Haw. 418, 426–27, 558 P.2d 1012, 1017 (1976) (Hawai'i Penal Code commentary, while not evidence thereof, "is nevertheless expressive of ... legislative intent"), *cert. denied,* 431 U.S. 922, 97 S.Ct. 2193, 53 L.Ed.2d 235 (1977).

*Gaylord,* 78 Hawai'i at 139, 890 P.2d at 1179 (some brackets added and some in original).

**21.** *See Faulkner,* 61 Haw. at 178, 599 P.2d at 286 (holding that "[i]ntent is an essential element of the crime of criminal attempt").

course of conduct *intended* to reach the objective.[22]

In subsection (2) liability is imposed on a defendant who has intentionally engaged in conduct which is a substantial step in a course of conduct *intended or known* to culminate in a prohibited result.[23] Thus, a defendant who intends to destroy a building, and who regards the destruction of its inhabitants as a regrettable by-product, could be convicted of attempted murder ... if the defendant *intentionally* performed a substantial step (e.g., started a fire) which the defendant knew (i.e., was practically certain) would result in death....

(Emphases added.)

■ "[W]e construe penal statutes narrowly, considering them in the light of precedent, legislative history, and common sense." *Gaylord*, 78 Hawai'i at 137, 890 P.2d at 1177. In doing so, we also seek to "'avoid absurd results.'" *Id.* at 138, 890 P.2d at 1178 (quoting *State v. Taylor*, 49 Haw. 624, 635, 425 P.2d 1014, 1021 (1967)). Viewing the plain language of HRS § 705–500 commonsensically and in the light of its commentary, we distill the following propositions: (1) being unconditional in its prefatory language, HRS § 705–500(1) addresses the universe of criminal attempts; (2) HRS § 705–500(1)(a), in

substance, imposes criminal attempt liability on a defendant who, by virtue of his or her intentional conduct, believes that he or she has committed a criminal offense, but, by virtue of his or her mistaken impression of attendant or other circumstances, has not actually done so; (3) HRS § 705–500(1)(b), in substance, imposes criminal attempt liability on a defendant who, by virtue of his or her intentional conduct, has purposefully and substantially undertaken to commit a criminal offense, but, because of factors not of his or her choosing, has failed to consummate it; and (4) HRS § 705–500(2) superimposes a gloss on the general attempt liability described in HRS § 705–500(1) in instances "when causing a particular result is an element of the crime," such that, so long as the defendant acts "with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime," either an *intentional* or a *knowing* state of mind will suffice to establish liability with respect to the result specified in the definition of the crime.[24]

### 3. *Hawai'i law of involuntary and voluntary manslaughter*

Pursuant to HRS § 707–702, there are "separate means of proving manslaughter ... and ... a *reckless* state of mind [is]

---

22. *See Reiger*, 64 Haw. at 512, 644 P.2d at 962.

23. *See supra* note 16.

24. The circuit court in the present case was obviously aware of the imperatives of HRS §§ 705–500(1)(b) and 705–500(2). Court's Instruction No. 5, which was read to the jury by agreement of the parties and correctly instructed the jury as to the general law of attempt liability, provided in relevant part:

> A person is guilty of an attempt to commit a crime if he intentionally engages in conduct which, under the circumstances as he believes them to be, constitutes a substantial step in a course of conduct *intended* to culminate in his commission of the crime.
>
> When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct *intended or known* to cause such a result.

(Emphases added.) *See supra* note 1.

In stark contrast, however, and in order to describe "Attempted Manslaughter (Reckless conduct)" in the disputed instruction, the circuit court had little choice but to torture the plain language of HRS § 705–500 by instructing the jury that "[a] person commits the offense of Attempted Manslaughter if he intentionally engages in conduct, which under the circumstances as he believed them to be, constituted a substantial step in a course of conduct *to recklessly cause* the death of another person." (Emphasis added.) Thus, at the very least, the disputed instruction was *inconsistent* with Court's Instruction No. 5; moreover, if only by failing to comply with the express terms of HRS §§ 705–500(1)(b) and 705–500(2), the disputed instruction was also *erroneous*. *See Kinnane*, 79 Hawai'i at 49, 897 P.2d at 976; *Hoey*, 77 Hawai'i at 38, 881 P.2d at 525; *Kelekolio*, 74 Haw. at 514–15, 849 P.2d at 74. Furthermore, as should be becoming increasingly apparent, the disputed instruction was likewise erroneous for a more basic reason.

*required* to prove one of those means." *Pinero II,* 75 Haw. at 296, 859 P.2d at 1376 (emphases added and footnote omitted). Specifically, "[a] conviction under [HRS § 702(1)(a) ] *requires* a showing that [the defendant's] conduct was *reckless." State v. Baker,* 67 Haw. 471, 474–75, 691 P.2d 1166, 1169 (1984) (emphases added and footnote omitted). *See supra* note 2. By contrast, "[u]nder the [HPC], the crime of murder may be mitigated to manslaughter pursuant to HRS § 707–702(2)[.]" *State v. Matias,* 74 Haw. 197, 199, 840 P.2d 374, 376 (1992) (describing the "manslaughter mitigation defense"). *See supra* note 7.

In a detailed and scholarly discussion, this court described the distinction between the two forms of manslaughter, identified in the previous paragraph, in *Pinero I, supra,* 70 Haw. 509, 778 P.2d 704 (1989), as follows:

> Manslaughter as defined by section 707–702(1)(a) unquestionably is a lesser included offense of murder since one cannot commit murder without also having committed manslaughter. The prohibited conduct in both involves the killing of another human being, and the culpable mental state required to establish manslaughter *stands below* that required to prove murder in the descending order of culpability delineated in the [HPC]. *See* HRS § 702–208, Commentary ("intent, knowledge, recklessness, and negligence are in a descending order of culpability"). Manslaughter as defined by HRS § 707–702(1)(a) thus may be established by the same or less than all the facts required to prove murder; and this renders it a lesser included offense of murder. *See* HRS § 701–109(4)[.]
>
> The provisions of HRS § 707–702(2), however, do not describe an offense as such; they serve, instead, to reduce murder to manslaughter when mitigating mental or emotional disturbances are present. *See* HRS § 707–702 commentary. The offense, more accurately *the mitigating defense, has been characterized as voluntary manslaughter because it involves the intentional or knowing killing of another while under the influence of a reasonably induced extreme mental or emotional dis-*

*turbance causing a temporary loss of normal self-control.* But for the presence of these extenuating circumstances the intentional or knowing killing of another human being would be murder, unless of course it is justifiable under other provisions of the [HPC].

*Id.* at 523–24, 778 P.2d at 713–14 (footnote, some citations, some internal quotation marks, brackets, and ellipsis points omitted) (emphases added).

With respect to the present appeal, the foregoing discussion in *Pinero I* is noteworthy for several reasons. First, for purposes of HRS § 701–114(1)(b), it conclusively identifies *recklessness* as the "state of mind *required* to establish each element of the offense" of manslaughter. (Emphasis added.) *See also Pinero II,* 75 Haw. at 296, 859 P.2d at 1376; *Baker,* 67 Haw. at 474–75, 691 P.2d at 1169.

Second, and correlatively, manslaughter as defined by HRS § 707–702(1)(a) *could not* be a *"lesser* included offense of murder" (emphasis added) if that form of manslaughter contemplated *intent* or *knowledge* as requisite states of mind; if such were the case, as noted above, second degree murder in violation of HRS § 707–701.5(1) and manslaughter in violation of HRS § 707–702(1)(a) would be the *same* offense—a manifestly absurd result. *Cf. Two Problems* at 434 ("Recklessness ... [is] incompatible with desire or intention"); *Stennet,* 564 So.2d at 96–97 (" 'intent' and 'recklessness' are incompatible terms").

Third, HRS § 707–702(1)(a) is therefore the only form of *involuntary* manslaughter codified in the HPC. *Cf.* 4 W. Blackstone, *Commentaries* at 192; *Almeda,* 455 A.2d at 1329 ("Involuntary manslaughter is a homicide unintentionally caused.").

Fourth, HRS § 707–702(2) describes the only traditional form of *voluntary* manslaughter codified in the HPC, involving, as it does, the intentional or knowing killing of another while under the influence of a reasonably induced emotional disturbance causing a temporary loss of normal self-control. *Cf.* 4 W. Blackstone, *Commentaries* at 191–92; *Cox,* 534 A.2d at 1335 ("We define volun-

tary manslaughter as an *intentional* homicide, done in a sudden heat of passion, caused by adequate provocation, before there has been a reasonable opportunity for the passions to cool." (Emphasis in original.)); *Almeda*, 455 A.2d at 1329 & n. 5 ("[A]n intentional killing mitigated by circumstances evincing extreme emotional disturbance" is "analogous to the concept of voluntary manslaughter."); *Norman*, 580 P.2d at 240 (intentional killing due to mental or emotional disturbance deemed to be voluntary manslaughter).[25]

Finally, fifth, insofar as HRS § 707–702(2) does not constitute a criminal "offense" as such, but is a "mitigating defense" that serves to reduce murder to manslaughter, *see also Matias*, 74 Haw. at 199, 840 P.2d at 376, an alleged violation of the statute obviously could not be charged as voluntary manslaughter in an indictment or complaint; rather, a defendant can be convicted of this form of manslaughter only if he or she is initially charged with first or second degree murder and the prosecution fails to negative the defense of "extreme mental or emotional disturbance for which there is a reasonable explanation" beyond a reasonable doubt. *See* HRS §§ 701–114(1) and 702–205(b) (prosecution's burden of proof beyond a reasonable doubt includes negativing relevant non-affirmative defenses); *see also State v. McNulty*, 60 Haw. 259, 588 P.2d 438 (1978) (recognizing that prosecution must prove beyond reasonable doubt facts negating an ordinary defense), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), *overruled on other grounds, Raines v. State*, 79 Hawai'i 219, 225, 900 P.2d 1286, 1292 (1995); *State v. Anderson*, 58 Haw. 479, 572 P.2d 159 (1977) (recognizing that an affirmative defense is not an element of offense that must be negated by prosecution).

4. *Although a defendant charged with attempted murder may, pursuant to HRS §§ 705–500 and 707–702(2), be convicted of attempted manslaughter based upon extreme mental or emotional disturbance, the HPC does not recognize the offense of attempted manslaughter based upon a defendant's reckless conduct; accordingly, the disputed instruction was erroneous, and State v. Tagaro was wrongly decided.*

We now turn our attention to *State v. Tagaro*, 7 Haw.App. 291, 757 P.2d 1175, *cert. granted*, 69 Haw. 678, —— P.2d —— (1987), *cert. dismissed*, 70 Haw. 666, 796 P.2d 502 (1988), which seems, without apparent attribution in the record before us, to be the genesis of the disputed instruction. In *Tagaro*, which, as far as we can tell, this court has never cited as authority, with or without approval, the defendant (Tagaro) appealed his conviction of attempted murder, in violation of HRS §§ 705–500 and 707–701 (1985).[26] The appeal was assigned to the ICA, which characterized the "dispositive issue" as "whether it was plain error for the trial court to fail to instruct the jury, *sua sponte*, that if it did not find [Tagaro] guilty of the attempted murder charge, it could find him guilty of the included offense of attempted manslaughter." *Id.* at 292, 757 P.2d at 1176. Answering the question posed by the "dispositive issue" in the affirmative, the ICA vacated Tagaro's conviction and remanded for a new trial, *id.*, pursuant to the following thought process:

In our view, although HRS § 707–702(1)(a) defines manslaughter as causing the death of another through recklessness, the statute was intended by the legislature to include both offenses of *involuntary* manslaughter, where the killing was *unintentional*, and *voluntary* manslaughter, where the killing was *intentional.* Stated otherwise, the word "recklessly" in the

---

25. We are aware that HRS § 707–702(1)(b) (1993) provides that "[a] person commits the offense of manslaughter if ... he [or she] intentionally causes another person to commit suicide." This form of manslaughter does not appear to have been recognized at common law, and the commentary on HRS § 707–702 acknowledges that "other codes have treated [it] as a separate offense[.]"

26. HRS § 707–701 (1985), with some differences not material to this appeal, is the statutory predecessor to HRS § 707–701.5 (1993), which was enacted in 1986. 1986 Haw.Sess.L.Act 314, § 50 at 616.

statute does not preclude prosecution or conviction for an intentional homicide which was committed under circumstances which provided mitigation but did not completely excuse the act. The commentary to HRS § 707–702 [ (1993) ] points out that

> [i]n the case of an intentional or knowing killing, where mitigating circumstances are present, the prosecutor may, but need not, bring a prosecution for murder. He may, if he chooses, bring a prosecution for manslaughter. Since recklessness will be satisfied by proof that the defendant acted intentionally or knowingly, a charge of manslaughter could be employed where a prosecutor, in his discretion, did not wish to push for a murder conviction. . . .

Additionally, HRS § 702–208 [ (1993) ] states in part that, "[w]hen the law provides that recklessness is sufficient to establish an element of an offense, that element also is established if, with respect thereto, a person acts intentionally or knowingly."

Clearly, then, a person can be found guilty of "recklessly" causing the death of another, even when he or she acted intentionally or knowingly. It follows that a person charged with attempted murder, an intentional crime, may be found guilty of attempted manslaughter if the person acted intentionally or knowingly under mitigating circumstances that do not constitute complete justification.

Here, [Tagaro] claimed to have shot at the alleged victim in self-defense. He was entitled to have the jury consider whether his belief in the necessity for the use of deadly force was reasonable and would completely absolve him of any crime or was, at least, sufficient to reduce the crime from attempted murder to attempted manslaughter. The charge to the jury limited the jury's choices and prejudiced [Tagaro]. Under the instructions as given, the jury, even though it may have been persuaded that there was some justification for [Tagaro's] actions, may have been unwilling, because of the deadly force used by [Tagaro], to reduce the attempted murder charge to

the included assault offenses outlined in the instructions.

On the basis of the foregoing discussion, we hold that the crime of attempted manslaughter under the circumstances of this case is an included offense of attempted murder, and the trial court in the instant case was required to, *sua sponte*, instruct the jury that it could find [Tagaro] guilty of that included offense if it did not find him guilty of attempted murder.

*Id.* at 296–97, 757 P.2d at 1178–79 (some emphases added).

The *Tagaro* court was, of course, in harmony with the rest of the American legal community in its understanding that manslaughter is "involuntary . . . where the killing was unintentional" and "voluntary . . . where the killing was intentional." Beyond that, the reasoning of *Tagaro* flies directly in the face of the HPC and its commentary, *Baker, Pinero I,* and *Pinero II* and is therefore flawed for several reasons.

■ First, the *Tagaro* court misapprehended the clear import of HRS § 702–208 and the commentary on HRS § 707–702. As we have noted, a *reckless* state of mind "required" or "specified" by the statutory language of an offense is not transmogrified into a "required" or "specified" *intentional* or *knowing* state of mind merely because the latter, through HRS § 702–208, proves the former. Within constitutional limits, it is *always* the prosecution's prerogative to undercharge any offense for whatever reason it deems appropriate, be it "mitigating circumstances" (in the "non-term of art" sense) or otherwise. Thus, it is self-evident, as the commentary on HRS § 707–702 acknowledges, that the prosecution may charge an intentional or knowing homicide (murder) as a reckless homicide (manslaughter) if it wants to, just as it may charge an intentional or knowing infliction of serious bodily injury (assault in the first degree) as a reckless infliction of serious bodily injury (assault in the second degree). Nevertheless, undercharging an offense does not and cannot *elevate* the requisite state of mind specified by the definition of the *charged* offense. *See* HRS §§ 701–114(1)(b), 702–204, and 702–205. Were this not so, as demonstrated above,

murder would be indistinguishable from reckless manslaughter and assault in the first degree would be the same as one form of assault in the second degree. Put differently, undercharging murder as "reckless manslaughter" does not and cannot reconstruct "involuntary" manslaughter into "voluntary" manslaughter.

Second, the *Tagaro* court overlooked the fact that the *only* non-exculpatory circumstance that the HPC recognizes as being legally capable of "mitigating" murder to manslaughter is the "mitigation" of "extreme mental or emotional disturbance for which there is a reasonable explanation" as set forth in HRS § 707–702(2). *See Pinero I*, 70 Haw. at 523–24, 778 P.2d at 714. Thus, it is in HRS § 707–702(2), and not HRS § 707–702(1)(a), that the legislature has codified the common law of "voluntary" manslaughter. *Id.*

Third, the *Tagaro* court misconstrued the significance of the defendant's assertion of the justifiable use of deadly force (*i.e.*, self-defense) in the context of his prosecution for attempted murder. Unlike Wisconsin, the Hawai'i legislature has not written "the crime of attempted imperfect self-defense manslaughter," *see supra* note 17, into the HPC, and the "provisions of [the HPC] cannot be extended by analogy so as to create crimes not provided for [there]in[.]" HRS § 701–104 (1993). Tagaro was certainly entitled to have the jury consider his claim of self-defense; however, if the prosecution succeeded in negativing the defense beyond a reasonable doubt, *see* HRS §§ 701–114(1)(a) and 702–205(b), then his intentional or knowing conduct was without justification and, therefore, unmitigated. *See* 4 W. Blackstone, *Commentaries* at 191–92. *Cf. State v. Warner*, 58 Haw. 492, 501, 573 P.2d 959, 964–65 (1977) (holding that, in murder prosecutions, where evidence necessitates an instruction on self-defense, trial court shall also instruct jury regarding mitigating defense of manslaughter by virtue of "mental or emotional disturbances," unless trial court agrees with defendant that record lacks any support for manslaughter instruction).

Finally, fourth, the *Tagaro* court dodged the question of how a jury instruction on "attempted manslaughter" in violation of HRS §§ 705–500 and 707–702(1)(a) would read. We fail to perceive by what means the trial court could have addressed the conundrum faced by the circuit court in the present case, *see supra* note 24, and have managed to avoid the commission of potentially reversible error.

We agree with the rest of the Anglo-American jurisprudential world that "there can be no attempt to commit involuntary manslaughter." *Two Problems* at 434. *See generally* the cases cited in section III.A.3.a. of this opinion. Therefore, in light of this jurisdiction's criminal attempt liability statute, HRS § 705–500, as construed *supra* in section III.B.2. of this opinion, we hold that there can be no offense of "attempted manslaughter" within the meaning of HRS § 707–702(1)(a), and, by so doing, we expressly overrule *Tagaro*. Accordingly, we further hold that the circuit court's disputed instruction in the present case was erroneous because it described a nonexistent offense.

On the other hand, consistent with 4 W. Blackstone, *Commentaries* at 191–92, *Two Problems* at 434, and the reasoning of the cases cited in section III.A.3.b. of this opinion, we hold that a defendant charged with attempted murder, in violation of HRS §§ 705–500 and 707–701.5, may be convicted of attempted manslaughter, in violation of HRS §§ 705–500 and 707–702(2), by virtue of "extreme mental or emotional disturbance for which there is a reasonable explanation." In this respect, we agree with the ICA's statement in *State v. Nizam*, 7 Haw.App. 402, 410, 771 P.2d 899, 904, *reconsideration denied*, 7 Haw.App. 668, 807 P.2d 54, *cert. denied*, 70 Haw. 666, 796 P.2d 502 (1989), that "a defendant charged with attempted murder [can] ... rely on the defense of extreme mental or emotional disturbance afforded by HRS § 707–702(2)[.]"

IV. *UNDER THE CIRCUMSTANCES OF THIS CASE, GIVING THE DISPUTED INSTRUCTION WAS HARMLESS ERROR.*

In his application for a writ of certiorari, Holbron challenges the ICA's holding that

the giving of the disputed instruction constituted harmless error, arguing as follows:

> The basis for the [ICA's opinion] was what was perceived to have occurred or not occurred in the jury deliberation room. However, inquiry into jury deliberations is restricted by Rule 606(b), [Hawai'i] Rules of Evidence ("HRE").[27]
>
> . . . .
>
> . . . [T]he rule bars inquiry concerning the "effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict." The rule also bars inquiry concerning the juror's mental processes in connection therewith.

The prosecution counters that Holbron "misapplies" HRE 606(b) because, "on its face, [HRE 606(b) ] bars only *testimony* by juror's [sic] concerning their deliberative process, not inquiry into it." (Emphasis in original.)

■ We agree with the prosecution that HRE 606(b) does not prohibit "inquiry into" the deliberative processes of juries; moreover, we have frequently engaged in such inquiries in the past. *See, e.g., State v. Furutani*, 76 Hawai'i 172, 185–87, 873 P.2d 51, 64–66 (1994) (inquiring into juror misconduct during deliberations). In any event, it is apparent that Holbron's argument is misplaced because HRE 606(b) is not even implicated in the ICA's decision.

■ In its decision, the ICA engaged in the following harmless error analysis:

> The [circuit] court instructed the jury that if it was "unable to agree that the [prosecution] has proven beyond a reasonable doubt" that [Holbron] had committed the offense of Attempted Murder, the jury could then go on to consider the lesser included offense of "Attempted Manslaughter (Reckless Conduct)." . . .
>
> *We presume that the jury followed the [circuit] court's instructions and first con-*

*sidered the evidence with regard to the Attempted Murder charge.* Consequently, the jury would first have considered the charged offense and would have gone on to consider any lesser offense only if they were unable to agree that the [prosecution] had proven [that Holbron] was guilty of the charged offense beyond a reasonable doubt.

> . . . .
>
> Based on this record, we are not convinced that there is a reasonable possibility that the erroneous instruction contributed to the jury's verdict.

ICA's decision at 6–7 (citations omitted) (emphasis added).

The ICA's analysis was correct, and *Yates v. Evatt, supra,* upon which Holbron relies in his application, supports that analysis. The *Yates* court expressly approved the

> sound presumption of appellate practice[ ] that jurors are reasonable and generally follow the instructions they are given. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant").
>
> To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.

*Id.,* 500 U.S. at 403, 111 S.Ct. at 1893. This court has repeatedly invoked the "presumption" (actually, as the *Yates* court indicated, a reasonable practical accommodation of the interests of the parties) in the past. *See, e.g., Aga v. Hundahl,* 78 Hawai'i 230, 236, 891 P.2d 1022, 1028 (1995); *Myers v. South Seas Corp.,* 76 Hawai'i 161, 165, 871 P.2d 1231,

---

27. HRE 606(b) (1993) provides:

Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict

or indictment, a juror may not testify concerning the effect of anything upon the juror's or any other juror's mind or emotions as influenc-

1235, *reconsideration granted in part,* 76 Hawai'i 353, 877 P.2d 890 (1994); *State v. Austin,* 70 Haw. 300, 308, 769 P.2d 1098, 1102 (1989); *State v. Estrada,* 69 Haw. 204, 222, 738 P.2d 812, 825 (1987); *State v. Perez,* 64 Haw. 232, 236, 638 P.2d 335, 338 (1981); *State v. Melear,* 63 Haw. 488, 497, 630 P.2d 619, 626 (1981); *State v. Amorin,* 58 Haw. 623, 629, 574 P.2d 895, 899 (1978).

Because, under the circumstances of this case, in reaching a unanimous guilty verdict as to the charged offense of attempted murder in the second degree, the jury could not have reached, much less considered, the disputed instruction that erroneously described a nonexistent offense, there is no "reasonable possibility that [the] error might have contributed to [Holbron's] conviction." *See Heard,* 64 Haw. at 194, 638 P.2d at 308. That being the case, "it affirmatively appears from the record as a whole that the error was not prejudicial." *Pinero I,* 70 Haw. at 527, 778 P.2d at 716. Accordingly, we hold that the giving of the erroneous disputed jury instruction was harmless beyond a reasonable doubt.

### V. *CONCLUSION*

Based on the foregoing analysis, we overrule *Tagaro, supra.* Nevertheless, for the reasons stated in this opinion, we affirm the judgment of the ICA affirming the circuit court's judgment of conviction.

---

ing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. Nor may the juror's affidavit or evidence of any statement by the juror indicating an effect of this kind be received.