92 P.3d 1027

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Denise REDULLA, Defendant–Appellant,
and Mahealani Leao, Defendant**

**and**

**State of Hawai'i, Plaintiff–Appellee,**

v.

**Mahealani Leao, Defendant–Appellant,
and Denise Redulla, Defendant.**

**Nos. 24266, 24311.**

Intermediate Court of Appeals of Hawai'i.

April 30, 2004.

Dana S. Ishibashi, on the briefs, for defendant-appellant Denise Redulla.

Sheila P. Lippolt, deputy public defender, State of Hawai'i, on the briefs, for defendant-appellant Mahealani Leao.

James M. Anderson, deputy prosecuting attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee in appeal No. 24266.

Bryan K. Sano, deputy prosecuting attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee in appeal No. 24311.

BURNS, C.J., WATANABE, and LIM, JJ.

Opinion of the Court by WATANABE, J.

Following an incident that occurred on a Waikīkī sidewalk on the morning of March 15, 2000, Defendant–Appellant Mahealani Leao (Leao) and Defendant–Appellant Denise Redulla (Redulla) (collectively, Defendants) were indicted and charged with committing the offense of Attempted Assault in the First Degree against James Hill (Hill or Mr. Hill), Leao's former boyfriend and the father of Leao's child. A jury found Defendants guilty of Attempted Assault in the Second Degree, in violation of Hawaii Revised Statutes (HRS) §§ 705–500 (1993) [1] and 707–711 (1993),[2] and this consolidated appeal [3] from separate April 30, 2001 judgments entered by the Circuit Court of the First Circuit (the circuit court), Judge Karl Sakamoto presiding, followed.

We conclude, in light of *State v. Rapoza*, 95 Hawai'i 321, 22 P.3d 968 (2001), that the instructions given to the jury regarding Attempted Assault in the Second Degree were plainly erroneous. Accordingly, we vacate the judgments and remand for a new trial.

## BACKGROUND

Leao and Hill met in Hawai'i in 1996 and began a two-year relationship. Leao moved

---

1. Hawaii Revised Statutes (HRS) § 705–500 (1993) provides:

 **Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:
 (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
 (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
 (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
 (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

2. HRS § 707–711 (1993) states, in relevant part, as follows:

 **Assault in the second degree.** (1) A person commits the offense of assault in the second degree if:

 (a) The person intentionally or knowingly causes substantial bodily injury to another;
 (b) The person recklessly causes serious bodily injury to another person;
 . . . ;
 (d) The person intentionally or knowingly causes bodily injury to another person with a dangerous instrument; . . .
 . . . .
 (2) Assault in the second degree is a class C felony.
 The term "[s]ubstantial bodily injury" is defined in HRS § 707–700 (1993), in relevant part, as follows:
 "Substantial bodily injury" means bodily injury which causes:
 (1) *A major avulsion, laceration, or penetration of the skin;*
 (2) A chemical, electrical, friction, or scalding burn of second degree severity;
 (3) A bone fracture;
 (4) A serious concussion; or
 (5) A tearing, rupture, or corrosive damage to the esophagus, viscera, or other internal organs.
 (Emphasis added.)
 The term "[b]odily injury" is defined in HRS § 707–700 as "physical pain, illness, or any impairment of physical condition."

3. The appeals were consolidated by this court pursuant to an order dated March 25, 2004.

in with Hill, and the two eventually had a daughter, born on August 24, 1998 (Daughter). Shortly after Daughter's birth, Hill moved to his parents' home in Memphis, Tennessee "to get everything set up." Leao and Daughter joined Hill a month later, but in November 1998, Leao and Hill severed their relationship, and Leao returned to Hawai'i with Daughter. Thereafter, the only contacts between Hill and Leao were two or three telephone calls to discuss Daughter.

In early March 2000, unbeknownst to Leao, Hill returned to Hawai'i[4] and stayed in the home of Janice Anderson (Anderson), the mother of a close friend. On March 15, 2000, Leao's and Hill's paths crossed on a sidewalk in Waikīkī. Exactly how their paths crossed, however, was the subject of much conflicting testimony at trial.

### A. Plaintiff–Appellee State of Hawai'i's (the State) Witnesses

#### 1. James Hill's Testimony

Hill testified that on the evening of March 14, 2000, Kevin Davis (Davis), Anderson's son, got off work around midnight and asked Hill to "go out and run around." Hill agreed, and the two headed in Davis's car to an exotic dance club, where they stayed for half an hour to an hour and Hill drank a bottle of beer, and then to Waikīkī. They parked on Hobron Lane, then walked to the Wave Night Club (the Wave), located on the corner of Kalākaua Avenue and 'Ena Road, where they stayed for about fifteen minutes and Hill had a complimentary beer.

As the two men headed back to Davis's car, they saw four young women in the parking lot of a 7–Eleven store across the street, who looked like they were walking towards the Wave. Davis and Hill did not immediately recognize any of the women but called out, "[H]ey, what's up," and crossed the street to initiate a friendly conversation.

Before reaching the women, however, Hill, out of the corner of his left eye, spotted Leao, who appeared to be standing off to the

side by herself. According to Hill, he and Leao both stopped and looked at each other and Leao seemed like "a dear [sic], [when] headlights get on it just like in shock[.]" From about four to five feet away, Hill asked Leao where Daughter was and stated that he would like to see Daughter. Leao did not respond.

At that point, Hill recalled, one of the four young women in the parking lot came over, started screaming racial epithets at him, and asked him who he was and what he wanted. The woman "grabbed [Leao's] arm and pulled [Leao and] told her, hey let's go[,]" but Leao responded, "[L]et me go." The rest of the women, who had earlier been friendly, suddenly became angry and hostile. They, too, chimed in, asking Hill who he was and what he wanted. Hill noticed that one of these women was Redulla, a friend of Leao whom he had met previously.

The women then pushed Hill backwards across 'Ena Road to the concrete driveway of a car rental agency. There, Hill tripped backwards over a chain across the driveway, fell to the ground, and struck his head. He momentarily lost consciousness, and when he came to, he saw shiny, sharp objects coming at him and felt himself being punched on his left side. Still on his back, Hill observed the five women crouched over him and saw Defendants on his left side, slashing at him with something shiny and sharp, which he assumed were knives. Leao swung at him with a "slash-type motion," and Hill "felt [a] sting, kind of a burning sensation" across his chest area. When Redulla began making similar motions at him, Hill put up his hands to block her, and Redulla cut into his elbow, arm, and hands. Hill also felt someone, whom he did not see, biting his left leg.

Screaming for help from Davis, Hill closed his eyes in an attempt to protect his face from his attackers. Davis pulled the women off of Hill and helped Hill up. Hill then tried to back up and make it to the car, but Leao grabbed him and started punching his eye and head. Leao also grabbed a chain around

---

**4.** James Hill (Hill) testified at trial that because Defendant–Appellant Mahealani Leao (Leao) had made it clear that she was not going to let him see their daughter (Daughter), he returned to

Hawai'i to "go through the courts" to see Daughter. According to Hill, he had spoken with the Child Support Enforcement Agency to inquire about "taking care of my child."

Hill's neck. Realizing at that point that he was bleeding and that his "life was truly in danger[,]" Hill let Leao see the blood and cuts on him and begged her to help him. Leao then stopped what she was doing and let him go.

Out of the corner of his eye, Hill saw Redulla go to a car in the 7–Eleven parking lot and return with a gun, which she passed to the woman who had previously tried to pull Leao away from Hill. Initially, the un-identified woman took the gun and put it at Davis's head. However, when Hill told the woman not to shoot Davis but to shoot him instead, the woman put the gun to Hill's head. After standing there for a moment, Hill turned towards the security guards at the nearby Waipuna Condominium security shack and asked the guards for help, saying "[S]he has a gun, she has a gun." The guards told him that the police had already been called.

Five or six police officers soon arrived at the scene, but by then, the women had begun walking down 'Ena Road towards Kalākaua Avenue. Hill ran up to a police officer, asked for help, and explained that he had been stabbed and a gun placed at his and Davis's heads. Instead of taking statements, search-ing the women, or doing any investigation, the police officer directed Hill to lay on the ground as if Hill "was going to be put under arrest." Confused, Hill tried to explain that he needed help. It was only when Hill showed the officer his arm that the officer realized that Hill was bleeding and "backed up."

No ambulance arrived at the scene, and the police walked off without asking Hill's name or getting any information from him. Davis remarked to Hill that the police were not going to help, then put Hill into the car and drove Hill to the emergency room at Queen's Medical Center.

At the hospital, Hill was treated for cuts to the middle and top of his left middle finger, cuts to his left elbow and wrist, and "slashes"

on other parts of his left arm. The injuries on Hill's left arm were sutured, resulting in permanent scarring. Hill also sustained in-juries on the left side of his chest under his armpit, a stab wound to his stomach, and a bite mark on his left upper thigh area. Hill stated that the doctors treating him called police officers who happened to be in the hospital on another case to interview Hill about the incident.

According to Hill, the hospital placed Hill's cut-up clothing (a Nike Air Jordan jacket, a Nike shirt, and his underwear), as well as Hill's bloody and broken prescription glasses, in a bag and returned the bag to him when he left the hospital. A month or two later, at a police detective's request, Hill brought the bag of clothing to the detective.

### 2. *Jeffrey Eggersgluss's Testimony*

Jeffery Eggersgluss (Eggersgluss) testi-fied that in the early morning of March 15, 2000, he was working as a security guard at the Waipuna Condominium (Waipuna) in Waikīkī when he heard a lot of yelling and arguing "[o]n the sidewalk bordering Waipu-na and . . . the rental lot next door."

Eggersgluss looked out of the guard shack he was in to see what was going on and saw a confrontation between a male, later identified as Hill, and four or five females.[5] At first, Eggersgluss "observed some arguing[,]" then started "seeing a little pushing and shoving." He then saw a male arm flying back and "[a]bout four or five females and few [sic] other males behind [the male]." Eggers-gluss next saw "a bunch of women covering [the male] 'cause at that point I couldn't see him anymore. When that happened, I couldn't see him 'cause he disappeared." Eggersgluss moved to about five or six feet away from the fracas[6] and observed "a group of girls and a guy trying to get away from them." Eggersgluss noticed the wom-en's arms moving while the male "was de-fending himself trying to just stop anything."

---

5. Jeffrey Eggersgluss (Eggersgluss) also noticed a few other males whom he thought were with Hill. These men stood off to the side and did not take part in the confrontation between Hill and the women.

6. Eggersgluss testified that he was standing in-side the Waipuna Condominium property be-cause he could lose his job if he set foot on the public sidewalk.

The male "was trying to walk backwards or sideways, whichever way he could move to just get out of that situation he was in."

Eggersgluss's attention was drawn to one of the women, whom he positively identified at trial as Leao and who seemed "very vocal with [Hill] and kept trying to go after [Hill]." At trial, Eggersgluss also identified Redulla as one of the women accosting Hill.

Hill then broke away and started "making his way back down the sidewalk towards . . . Ala Moana Boulevard." A few of the women pursued Hill, and Eggersgluss heard one of them say, "[H]urry up, we got to go. Security saw us, you know. Police are coming. And we've to go."

At that point, Eggersgluss testified, Hill proceeded

> to go down the walk trying to get away while a few of the females I guess pursue. And he ends up—he ends up at that point at the exit of our Waipuna driveway where he upon—where he then enters our driveway which at that point we could then do something.

Eggersgluss went back to the Waipuna guard shack and called 911.[7] From the guard shack, Eggersgluss could see Hill "going down the walk and trying to get away." Eggersgluss also heard "yelling and whatnot[.]" A crowd of people had gathered to see what was happening, and Eggersgluss observed Leao yelling at Hill, swinging her arms towards Hill, and Hill backing away. Eggersgluss did not see Hill swing out to hit Leao. Eggersgluss also did not see any weapons, although he heard Hill comment, "She's got a gun. She's got a gun[,]" and then, "[S]he's got a knife, she's got a knife."

Hill then stepped onto the Waipuna property, "[p]eople started following," and Eggersgluss tried to keep Hill separated from Leao. When Hill walked towards the guard shack, he was bleeding and had a slice on his finger or hand and a cut on his arm over to the side. There were also blood spots leading "from the driveway to the guard shack." Five or six police vehicles showed up within two or three minutes of Eggersgluss's 911 call, and the police questioned Hill, the females, other witnesses, and then Eggersgluss. To the best of Eggersgluss's knowledge, Hill then left the scene in an ambulance.

On cross-examination by Leao's counsel, Eggersgluss confirmed that when he initially saw Hill backing away from Kalākaua Avenue on 'Ena Road towards Hobron Lane, Hill "wasn't doing anything" and Leao was "the aggressive one[.]" Eggersgluss agreed that from five or six feet away, he saw Hill being pulled down, stumble to the ground, and "get buried" by the females. He was not sure which of the women pulled Hill down because "there were so many females around him[.]"

According to Eggersgluss, when Hill fell, he "landed on his rear" and was covered by the four or five females. Eggersgluss saw both Hill's and the women's arms moving. Hill's arms were "[f]lailing about defensively, . . . trying to get out of there, using his hands to get out of there[.]" Hill eventually backed away from the pile of women and got to his feet. As Hill retreated towards the guard shack, the women followed and tried to hit him. Eggersgluss did not see Hill get struck, but while Leao was swinging at Hill, Eggersgluss heard Hill say, "[S]he's got a gun[.]"

### 3. *Dr. Mitchell Rosenfeld's Testimony*

Dr. Mitchell Rosenfeld (Dr. Rosenfeld), an emergency medicine physician who examined Hill at Queen's Medical Center on the morning of March 15, 2000, testified that Hill had "multiple lacerations to his left arm, his left middle finger, the left side of his trunk or chest wall, an abrasion to his neck, and contusions and abrasions to the [left] side of his face[.]" The laceration to Hill's left middle finger was "lunar in shape," "deep[,]" and raised concerns that there may be "some tendons injury[,]" which could cause "[l]oss of function, [and inability] to perform certain motions that we take for granted." The lacerations to Hill's forearm included a proximal deeper laceration around the elbow area,

---

7. Eggersgluss testified that he did not earlier try to assist Hill directly because if he set foot on public property and got hurt, he would be liable and could lose his job. He also was not aware at the time that Hill was being injured.

which raised concerns about tendon and muscle damage, as well as more distal lacerations extending to the wrist. Based on his experience, Dr. Rosenfeld opined that a "sharp implement with a sharp edge" created the type of injury pattern sustained by Hill.

Dr. Rosenfeld also testified that Hill sustained a "superficial linear laceration" to the "left lower quadrant" of his abdominal wall below the belt line. Additionally, Hill complained of an injury to his left leg, and Dr. Rosenfeld noticed that Hill's "left eye was irritated, the tissue that covers the white of the eye on the left eye was red and swollen." Furthermore, "the left side of the bone of the eye ... what we call the left periorbital was soft tissue swelling" and there was an "abrasion to right lateral neck."

Dr. Rosenfeld gave Hill a tetanus shot and antibiotics, had an orthopedic surgeon evaluate and x-ray Hill's tendon injuries, cleaned and sutured Hill's wounds, splinted Hill's hand, and provided Hill with out-patient medications.

On cross-examination, Dr. Rosenfeld agreed that most of Hill's wounds were not major avulsions, lacerations, or penetrations of the skin and did not create a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. However, Dr. Rosenfeld testified that the cut on Hill's left middle finger and the deeper cut on Hill's forearm were major avulsions, lacerations, or penetrations of the skin that were fairly serious and could have led to some loss of function.

#### 4. *Janice Anderson's Testimony*

Anderson testified that at about 4 o'clock on the morning of March 15, 2000, she received a telephone call from a person whose voice she recognized as Leao's. Leao asked to speak to Hill, whereupon Anderson told Leao that Hill was in the hospital, Leao knew why Hill was there, and "they didn't have to do him like that[.]" According to Anderson, Leao responded a "couple times" that Hill "didn't have to hit my girl."

#### 5. *Detective Gary Goeas's Testimony*

Detective Gary Goeas (Detective Goeas) was assigned to investigate the alleged assault on Hill after Hill showed up at the Queen's Medical Center emergency room. After interviewing numerous individuals, including Eggersgluss and Melepe Avium, the other security guard on duty at the Waipuna on March 15, 2000, Detective Goeas determined that Hill's version of the incident was more consistent. Detective Goeas recovered Hill's clothes on April 6, 2000, after learning that the clothes had not previously been recovered. According to the detective, the clothes looked "pretty well intact, because [Hill] still had it in the Queen's Medical bag."

### B. *The Defense's Witnesses*

#### 1. *Dean Kodama's Testimony*

Dean Kodama (Kodama) testified that on March 15, 2000, he drove into the 7–Eleven parking lot, where he "bumped into" Redulla, an acquaintance. As they were chatting, Kodama noticed Leao talking to some guy, identified at trial as Hill, then saw Leao telling the guy "leave me alone and stuff[.]" Leao and the guy then went across the street, and Kodama thought the guy was "just hitting on her outside the club or something, ... the way she was talking to him[.]" Kodama saw Leao and the guy having some type of argument and when Kodama looked up, he saw the guy hit Leao, "and then a fight broke out[.]"

According to Kodama, Redulla said, "Oh, shit, he hit my girl," then ran across the street. Kodama initially turned off his car's ignition and approached the area where the "fight broke out[.]" However, when he saw the security guards from the building next door approaching the fight, he decided not to get involved and returned to his car. The police arrived shortly thereafter.

#### 2. *Mahealani Leao's Testimony*

Leao testified that on the night in question, she and her housemate, Redulla, decided to go out to the Wave because it was Hip–Hop Night. While Redulla parked the car, Leao went into the 7–Eleven store. When Leao came out of the 7–Eleven, she saw

Redulla talking to Kodama. Leao went to the grassy corner of the 7-Eleven driveway to wait for Redulla.

As Leao was waiting, she looked around to see if she knew anybody going to the club. She saw three guys walking down the street, then heard somebody yell something loudly. Turning towards the yelling, she saw walking across the street, a guy whom she recognized as her ex-boyfriend, Hill, whom she had not spoken to since July 24, 1998. Leao hoped that Hill would not notice her, so she turned her back slightly towards him. When Hill did see her and started heading her way, Leao yelled to Redulla that she was going to the Wave and started walking across the street.

Hill caught up with Leao and asked her about Daughter, but Leao said nothing and tried to get away. Hill stepped in front of Leao and grabbed her arm several times in an effort to force her to "look at him and talk to him." Leao tried to push Hill away so she could leave, but Hill prevented her from doing so. Hill then punched Leao on the left side of her face, and as she fell, she pulled Hill down on top of her. She struggled to get away, but he pinned her down or pushed her. Hill pulled Leao's hair and arms, and Leao kicked with her feet, trying to push Hill off of her. Leao screamed for help and soon saw people pulling Hill off of her while Redulla helped her up.

After Leao got away from Hill, she ran down the street towards the Wave, but when she saw a taxi in front of the Wave, she got in and told the driver to go. After calming down, she realized she had left Redulla at the scene of the incident, so she told the taxi driver to drop her off at the McCully Shopping Center. At the shopping center, Leao called Redulla's cell phone to make sure Redulla was okay. Redulla then came and picked up Leao.

Leao then called Anderson because she was "scared that [Hill] was going to come and take [Daughter], or take [Leao] or hurt [them] or something." Leao also wanted to know why Hill was back in Hawai'i. When Anderson indicated that Hill was in the hospital, Leao responded that Hill had hit her and "hit my girl[.]" Leao denied injuring Hill on the night in question, and related that she did not know how Hill had been injured or what happened after she left the scene. She did not learn of the extent of Hill's injuries until she was served with a temporary restraining order (TRO) that "said all this stuff that [Hill] said I did[.]"

According to Leao, she had gone to Tennessee because Hill had promised to get a job, be a better person, and take responsibility, but within a week of her arrival, he wanted to quit his job and she discovered evidence that her bills were "in collection already[.]" When she informed Hill that she had decided to return to Hawai'i, Hill "got mad" and said that she could go, but not with Daughter. While Leao was changing Daughter's diaper on the bed, Hill threw Leao against the wall to get Daughter and would not give Daughter back to Leao. In an attempt to get Daughter back, Leao told Hill that she would not leave. However, Hill would not give up Daughter and told Leao to sleep downstairs so she could not leave with Daughter. The next day, while Hill took his father to the doctor, Leao packed and called for a taxi to the airport. Hill returned home before the taxi arrived and a "little squabble" ensued, but Hill's father intervened and allowed Leao to leave with Daughter.

Leao testified that since returning to Hawai'i, she was planning to change both her name and Daughter's name so Hill would not be able to find them.

On cross-examination by Redulla, Leao was asked about her telephone conversation with Anderson. The following colloquy ensued:

Q. . . . . [Y]ou know, when you spoke with [Anderson], she said that you said that, well, he didn't have to hit my girl. What did you tell her in that respect?

A. I said he didn't have to hit my grill.

Q. Your grill?

A. Hm-hmm, my face.

Q. And where does that come from, "grill"?

A. That's a slang term, "If you want to be my girl."

Q. It's a song, it comes from a certain kind of music that you guys listen to, it's part of the culture now?

A. Yeah.

On further cross-examination by the State, Leao denied that she had ever told Anderson that Hill "hit my girl[.]" Instead, Leao reiterated, she told Anderson several times that Hill hit her "grill[,]" meaning that Hill had punched her in the face. Leao explained that about five to ten minutes had elapsed from the time she left the scene until Redulla picked her up from McCully Shopping Center. When Leao called Redulla's cell phone, Redulla had already been driving around looking for Leao. Redulla never indicated to Leao that Redulla's car, which was parked in the same parking lot as Kodama's, had been blocked by police from exiting the parking lot or that police had arrived at the scene. The first time Leao and Redulla learned that police had arrived at the scene was when they read the TRO, which Hill had obtained against them.

### 3. *Denise Redulla's Testimony*

Redulla testified that at about "a quarter to 3:00" on the morning of March 15, 2000, she and Leao left to go to the Wave, where they often went on Tuesdays. They drove into the 7-Eleven parking lot on Kalākaua Avenue, and Redulla reverse-parked her car while Leao went into the store to get some water. As Redulla got out of her car, she saw Kodama, a former co-worker, parked in a car nearby and started making "small talk" with him. While talking to Kodama, Redulla heard Leao call out that she was going to the club. Redulla looked up and waved distractedly to show she understood but did not see Hill at that time. She first noticed Hill when she heard yelling and turned to see Hill and Leao in the middle of the street. Leao was yelling at Hill, and Hill was blocking Leao's path and grabbing onto Leao whenever Leao tried to pass him. The two had reached the opposite sidewalk when Leao tried once more to pass Hill and Hill hit her.

As Hill hit Leao, the two fell to the ground and Redulla ran over to them as fast as she

could. Other bystanders also ran over to Hill and Leao. According to Redulla, "[e]verybody was making a lot of noise," and she tried "to pull [Hill] off of [Leao] along with everybody else." Eventually, Leao got away from Hill and ran towards the Wave. Redulla called to her, but Leao did not stop. Redulla then went back to her car and drove off to look for Leao. When Leao called Redulla on her cell phone, Redulla drove over to the shopping center to pick up Leao. Redulla stated that there were no police or security guards at the scene when she drove off. Additionally, she did not see any injuries on Hill when she left and did not know how he got them. She certainly did not have a knife or sharp, shiny object with her and did not cut Hill at all.

### C. *The Jury Instructions*

During the settlement of jury instructions, Redulla's counsel objected to the giving of an Assault in the Second Degree instruction as a lesser included offense of Attempted Assault in the First Degree[8]:

Your Honor, I object to the giving of this lesser included offense.

My client, from what she testified, was not involved in any kind of assault whatsoever.

In this case, I believe that the facts show there are two distinct versions under which the facts will be examined one under which is proposed by the complainant[, Hill,] and the other by my client[, Redulla].

In the—In giving this lesser instructions [sic], and, this goes for all of the lesser included instructions, the [c]ourt, if reviewing, I've reviewed State of Hawai'i versus Haanio which has been filed in the State of Hawai'i [S]upreme [C]ourt on January 31st year 2001, in that case it appears that there is a blanket type of instruction by the supreme court instructing the trial courts to give allowing the trial court's [sic] to give a lesser included instruction if there is a rationale [sic] basis in the evidence that is presented at trial.

Now, I—I would argue that in this case there is no rationale [sic] basis in the

---

8. Leao's counsel joined in on the objection.

evidence at trial to give the lessors [sic] because in the trial [c]ourt's determination of whether or not a rationale [sic] basis exists it would inevitably have to make a determination that one of the versions of the facts in this case, particularly, the one being presented by the State through [Hill], is credible. And, I think that oversteps the boundary of the court in making decisions regarding credibility of the witnesses.

I think in that case, Haanio, the supreme court indicated that the jury is still the sole judge of the witnesses' credibility.

And, in order for anything, I believe, to be rationale, [sic] it must also be credible or at least present no questions as to the credibility.

And, I think that when the court decides to give a lesser included based on a determination that there's a rationale [sic] basis in the evidence, that it, in fact, is making a determination and accepting one version over the other in determining that, in fact, the evidence is rationále [sic], and, therefore, making a credibility determination in the facts of this case.

In Haanio, I believe, it's distinguishable and there the facts, according to the way it's presented by the supreme court, at least, do not appear to be contested facts. They tend to be accepted facts of the eye witness here.

Therefore, there not being the facts as they were presented were not contested by the defendant according to the way which is presented in their opinion.

And, therefore, we would object to the giving of any lesser included offenses instructions in this case. Thank you.

The circuit court gave the instruction, explaining as follows:

THE COURT: Okay, this instruction will be given over the objection of the defense.

Basically, the [c]ourt finds that there is a rationale [sic] basis for the giving of lesser instructions based on the general circum-

stances that this was a situation of numerous people being involved and there will be an instruction given as to the accomplice theory also.

The circuit court, over defense objections, also gave lesser-included-offense instructions regarding the offenses of Attempted Assault in the Second Degree and Assault in the Third Degree.

The jury instruction given by the circuit court on the offense of Attempted Assault in the First Degree was as follows [9]:

[The defendant] is charged with the offense of Attempted Assault in the First Degree.

A person commits the offense of Attempted Assault in the First Degree if she intentionally engages in conduct which under the circumstances as she believes them to be is a substantial step in a course of conduct intended *or known* to cause serious bodily injury to another person.

There are two material elements of the offense of Attempted Assault in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

One, that on or about March 15th, 2000, in the City and County of Honolulu, State of Hawaii, [the defendant] engaged in conduct which was a substantial step in a course of conduct intended *or known to be practically certain* by the defendant to cause serious bodily injury to [Hill]; and[ ]

Two, that the defendant did so intentionally.

*Conduct shall be considered a substantial—conduct shall not be considered a substantial step unless it is strongly corroborative of the defendant's intent to commit the offense of Assault in the First Degree.*

A person commits the offense of Assault in the First Degree if she intentionally or

---

9. The various lesser-included-offense instructions for Leao were identical except for the name of the defendant. The instructions are therefore quoted without reference to the name of the defendant.

knowingly causes serious bodily injury to another person.

(Emphases added.)

The instruction on the lesser included offense of Assault in the Second Degree was as follows:

> If, and, only if, you find [the defendant] not guilty of Attempted Assault in the First Degree or you are unable to reach an [sic] unanimous verdict as to this offense, then you must determine whether [the defendant] is guilty of the included offense of Assault in the Second Degree.
>
> A person commits the offense of Assault in the Second Degree if she intentionally or knowingly causes substantial bodily injury to another person.
>
> There are two material elements of the offense of Assault in the Second Degree each of which the prosecution must prove beyond a reasonable doubt.
>
> These two elements are:
>
> One, that on or about March 15th, 2000, in the City and County [of] Honolulu, State of Hawai'i, [the defendant] caused substantial bodily injury to [Hill]; and[ ]
>
> Two, that the defendant did so intentionally or knowingly.

The instruction to the jury regarding the offense of Attempted Assault in the Second Degree was as follows:

> If, and, only if, you find [the defendant] not guilty of Assault in the Second Degree or you are unable to reach an [sic] unanimous verdict as to this offense, then you must determine whether [the defendant] is guilty of the included offense of Attempted Assault in the Second Degree.
>
> A person commits the offense of Attempted Assault in the Second Degree if she intentionally engages in conduct which under the circumstances as she believes them to be is a substantial step in a course of conduct intended *or known* to cause substantial bodily injury to another person.
>
> There are two material elements of the offense of Attempted Assault in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.
>
> These two elements are:

> One, that on or about March 15th, 2000, in the City and County of Honolulu, State of Hawai'i, [the defendant] engaged in conduct which was a substantial step in a course of conduct intended *or known to be practically certain* by the defendant to cause substantial bodily injury to [Hill]; and[ ]
>
> Two, that the defendant did so intentionally.

(Emphases added.)

#### D. *The Jury's Verdict*

On March 7, 2001, the jury found both Leao and Redulla guilty of Attempted Assault in the Second Degree.

On March 20, 2001, Redulla filed a Motion to Arrest the Judgment or, in the Alternative, Motion for Judgment of Acquittal or, in the Alternative, Motion for New Trial. Redulla argued that the circuit court's jury instruction on Attempted Assault in the Second Degree was erroneous because it combined two distinct states of minds, intentional and knowing, although the essential element of Attempted Assault in the Second Degree is intentional conduct. She also claimed that the evidence at trial was not consistent with the verdict.

Leao filed a Motion for a New Trial on March 28, 2001, claiming that the verdict was "[m]anifestly [a]gainst [t]he [w]eight [o]f [e]vidence" and raised reasonable doubt about whether Leao **"intentionally or knowingly** attempted to cause substantial bodily injury[.]" Leao also argued that the circuit court erred by excluding evidence that Hill was, at one point, Leao's pimp.

The motions were denied and separate judgments were entered against Leao and Redulla on April 30, 2001. Defendants were sentenced to serve five years of probation and pay $1,197.91 in restitution to Hill (the restitution was stayed pending appeal).

An amended notice of appeal was filed by Redulla on May 15, 2001. Leao filed her notice of appeal on May 30, 2001.

### ISSUES ON APPEAL

Redulla claims that:

(1) The circuit court plainly erred in instructing the jury on Attempted Assault in the Second Degree;

(2) Attempted Assault in the Second Degree, within the facts of this case, is not a lesser included offense of Attempted Assault in the First Degree;

(3) The circuit court abused its discretion in determining that a rational basis existed for the giving of the lesser-included-offense instruction of Attempted Assault in the Second Degree; and

(4) The circuit court erred when it allowed the State to question Leao about what Redulla had told her when they met up at the McCully Shopping Center.

Leao claims that:

(1) The circuit court's instructions on Attempted Assault in the Second Degree were prejudicially confusing because they failed to instruct the jury that Leao's conduct must have constituted "a substantial step" "strongly corroborative" of her criminal intent;

(2) Evidence that Hill was Leao's pimp at one time should not have been prohibited by the circuit court; and

(3) Dr. Rosenfeld should not have been allowed to testify about the potential extent of Hill's cuts and injuries.

## DISCUSSION

A. *The Jury Instruction on Attempted Assault in the First Degree*

HRS § 705–500 imposes the following requirements for penal liability based on an attempt to commit a crime:

**Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:

(a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or

(b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

(2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

(3) *Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.*

(Emphasis added.)

In instructing the jury as to the offense of Attempted Assault in the Second Degree, the circuit court stated:

A person commits the offense of Attempted Assault in the Second Degree if [he or] she intentionally engages in conduct which under the circumstances as [he or] she believes them to be is a substantial step in a course of conduct intended or known to cause substantial bodily injury to another person.

There are two material elements of the offense of Attempted Assault in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

One, that on or about March 15, 2000, in the City and County of Honolulu, State of Hawai'i, [the defendant] engaged in conduct which was a substantial step in a course of conduct intended or known to be practically certain by the defendant to cause substantial bodily injury to [Hill]; and[ ]

Two, that the defendant did so intentionally.

In contrast to the foregoing instruction, the circuit court's instruction regarding the offense of Attempted Assault in the First Degree included the following paragraph, taken from HRS § 705–500(3) (1993), which further defined the term "substantial step":

Conduct shall be considered a substantial—conduct shall not be considered a

substantial step unless it is strongly corroborative of the defendant's intent to commit the offense of Assault in the First Degree.

### 1.

Defendants contend that the circuit court's failure to include a similar "strongly corroborative" instruction in the instruction as to Attempted Assault in the Second Degree was presumptively prejudicial and not harmless beyond a reasonable doubt. We agree.

In *State v. Rapoza*, 95 Hawai'i 321, 22 P.3d 968 (2001), the Hawai'i Supreme Court dealt with a similar situation. With respect to one count of Attempted Second Degree Murder, the *Rapoza* trial court had instructed the jury on the lesser included offense of Attempted Assault in the First Degree, including therein a paragraph explaining that "[c]onduct shall not be considered a substantial step under these—under this section unless it is strongly corroborative of the defendant's criminal intent." *Rapoza*, 95 Hawai'i at 324, 22 P.3d at 971. A similar "strongly corroborative" paragraph was omitted from the trial court's almost identical lesser-included-offense instruction on Attempted Assault in the First Degree, given with respect to a different attempted second degree murder count. *Id.* The supreme court held that this inconsistency was "presumptively harmful" and that "the error, at the time it was committed, was not harmless beyond a reasonable doubt[.]" *Id.* at 328, 22 P.3d at 975 (footnote omitted). The supreme court so ruled even though the trial court had given a general jury instruction on criminal attempt liability that included a "strongly corroborative" paragraph.[10]

In light of *Rapoza*, we conclude that the circuit court's omission of the "strongly corroborative" paragraph in the Attempted Assault in the Second Degree instructions in this case was presumptively prejudicial. For the following reasons, we also conclude that the omission was not harmless beyond a reasonable doubt. First, unlike in *Rapoza*, the circuit court in this case did not give the jury a general criminal attempt liability instruction. Second, the omission in this case was potentially more prejudicial than in *Rapoza*, since the jury could reasonably have assumed that it was not necessary for the State to establish that evidence adduced was "strongly corroborative" of Redulla's or Leao's criminal intent to commit the less serious offense of Attempted Assault in the Second Degree.

### 2.

Count I of the indictment charged Redulla as follows:

> On or about the 15th day of March, 2000, in the City and County of Honolulu, State of Hawaii, [Redulla] did intentionally engage in conduct which is a substantial step in a course of conduct intended or known to cause serious bodily injury to [Hill], thereby committing the offense of attempted Assault in the First Degree, in violation of Sections 705–500 and 707–710 of the Hawaii Revised Statutes.

The State thus charged Redulla with Attempted Assault in the First Degree pursuant to subsection (2) of HRS § 705–500, the statute defining criminal attempt. *See supra.*

The first paragraph of the circuit court's instruction to the jury as to the lesser included offense of Attempted Assault in the Second Degree, essentially mirrored subsection

---

**10.** In *State v. Rapoza*, the trial court gave the following general instruction as to criminal attempt liability:

> A person is guilty of an attempt to commit a crime if he intentionally engages in conduct which, *under the circumstances as he believes them to be,* constitutes a substantial step in a course of conduct intended to culminate in his commission of the crime.
>
> When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
>
> Conduct shall not be considered a substantial step under these—under this section unless it is strongly corroborative of the defendant's criminal intent.

*State v. Rapoza*, 95 Hawai'i 321, 324, 22 P.3d 968, 971 (2001).

(2) of HRS § 705–500 but substituted the subsection (1)(b) phrase "under the circumstances as she believes them to be" for the subsection (2) phrase "acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime." Redulla maintains that this blended instruction was prejudicially erroneous.

The supreme court explained the difference between the various subsections of HRS § 705–500 in *State v. Holbron*, 80 Hawai'i 27, 904 P.2d 912 (1995):

> Viewing the plain language of HRS § 705–500 commonsensically and in the light of its commentary, we distill the following propositions: (1) being unconditional in its prefatory language, HRS § 705–500(1) addresses the universe of criminal attempts; (2) HRS § 705–500(1)(a), in substance, imposes criminal attempt liability on a defendant who, by virtue of his or her intentional conduct, believes that he or she has committed a criminal offense, but, by virtue of his or her mistaken impression of attendant or other circumstances, has not actually done so; (3) *HRS § 705–500(1)(b), in substance, imposes criminal attempt liability on a defendant who, by virtue of his or her intentional conduct, has purposefully and substantially undertaken to commit a criminal offense, but, because of factors not of his or her choosing, has failed to consummate it; and (4) HRS § 705–500(2) superimposes a gloss on the general attempt liability described in HRS § 705–500(1) in instances "when causing a particular result is an element of the crime," such that, so long as the defendant acts "with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime," either an intentional or a knowing state of mind will suffice to establish liability with respect to the result specified in the definition of the crime.*

*Holbron* at 41, 904 P.2d at 926 (emphasis added.) In addition, the statutory commentary on HRS § 705–500 indicates that sub-

section (2) is the appropriate criminal attempt prong to be used when a defendant has

> intentionally engaged in conduct which is a substantial step in a course of conduct intended or known to culminate in a prohibited result. . . . Attempt liability is provided for a defendant who engages in such conduct because the defendant's manifestation of dangerousness is of the same order as that of the defendant who engaged in the intentional conduct of subsection (1).

Commentary on HRS § 705–500.

■ Inasmuch as the State charged Redulla with Attempted Assault in the First Degree pursuant to HRS § 705–500(2), which involves causing a particular result, namely "serious bodily injury," the circuit court's jury instructions on Attempted Assault in the Second Degree should similarly have been based on subsection (2), rather than on a blend of subsections (1)(b) and (2), of HRS § 705–500. On remand, the circuit court should use an instruction more consistent with the statute and the charge in the indictment.

### B. *Whether There Was a Rational Basis for Instructing the Jury on Attempted Assault in the Second Degree as a Lesser Included Offense*

Redulla claims that the circuit court erred by instructing the jury on the offense of Attempted Assault in the Second Degree as a lesser included offense of Attempted Assault in the First Degree[11] because there was no rational basis in the record for a verdict acquitting her of the offense charged and convicting her of the included offense. Redulla points out that "Dr. Rosenfeld's testimony confirmed that neither serious nor substantial bodily injury were [sic] accomplished" in this case.

HRS § 701–109 (1993) states, in relevant part, as follows:

> **Method of prosecution when conduct establishes an element of more than one offense. . . .**

---

11. The record reveals that the trial judge actually instructed the jury on Assault in the Second Degree as a lesser included offense of Attempted Assault in the First Degree and Attempted Assault in the Second Degree as a lesser included offense to Assault in the Second Degree.

. . . .

(4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:

 (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

 (b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

 (c) *It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.*

(5) *The court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense.*

HRS § 701–109 (emphasis added). In *State v. Haanio,* 94 Hawai'i 405, 413, 16 P.3d 246, 254 (2001), the supreme court held that HRS § 701–109 requires that trial courts *"must* instruct juries as to any included offenses when 'there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense[.]' " (Emphasis added.)

▮ In this case, the only material difference between First and Second Degree Attempted Assault is that Attempted Assault in the First Degree requires that Defendants take a substantial step towards causing "serious bodily injury" ("bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ"), while Attempted Assault in the Second Degree requires that Defendants take a substantial step towards causing "substantial injury" ("a major avulsion, laceration, or penetration of the skin") to Hill. Attempted Assault in the Second Degree is therefore a lesser included offense of Attempted Assault in the First Degree under HRS § 701–109(4)(c).

▮ Under the *Haanio* standard, moreover, a rational basis exists in the record to support the circuit court's determination that the jury could find Defendants guilty of Attempted Assault in the Second Degree but not Attempted Assault in the First Degree.

Eggersgluss's testimony that Defendants were among a group of women who were beating, and perhaps cutting, Hill while he lay on the sidewalk could easily have led the jury to conclude that Defendants intended to cause "substantial bodily injury" to Hill.

▮ Redulla appears to misunderstand the term "rational basis" when she argues that the circuit court's giving of the Attempted Assault in the Second Degree instruction as a lesser included offense implied to the jury that the circuit court found the State's witnesses credible. In *Haanio,* the supreme court explained that the point of the "rational basis" test is that the trial court does *not* have to make any judgments with regard to the weight or sufficiency of the evidence. *See Haanio,* 94 Hawai'i at 411–15, 16 P.3d at 252–255. The trial court must simply examine the record for *any* evidence that could lead the jury to reasonably acquit the defendant of the charged offense, yet convict under the lesser included offense. *Id.* If such an outcome is possible, the lesser-included-offense instruction must be given. *Id.*

C. *The Questioning of Leao About What Redulla Told Her About the Incident*

While Leao was being cross-examined at trial, the following exchange took place:

 Q. [ (By DEPUTY PROSECUTOR) ] And [Redulla] didn't tell you that the police came to the scene?

 A. No, I don't think—

 Q. [Redulla] didn't tell you that she had to wait until the police left?

 A. She left before the police even—

 [REDULLA'S COUNSEL]: Your Honor, I'm going to object. It's hearsay at

this point. He's asking her to comment on hearsay of a party involved in this action—

[DEPUTY PROSECUTOR]: A party-opponent, Your Honor.

[REDULLA'S COUNSEL]:—particularly [Redulla], and she hasn't had the opportunity to be confronted yet with a statement or anything.

THE COURT: Approach the bench.

(At the bench.)

[REDULLA'S COUNSEL]: Your Honor, it's not only hearsay, but what he's doing is he's trying to overcome [Redulla's] right to remain silent at this point. He's forcing the issue that [Redulla] must now take the stand to get up there and explain why certain things were done in a certain way, because he's talking about what she said, what she did. And all of what [Redulla] said or did or what [Redulla] knew or didn't know and all of this business, and what that is is [sic] comment, is an attempt to breach the right of [Redulla] to remain silent, basically.

[Redulla's] involved in this case and she deserves the right to get up there and tell her side of the story. And what he's doing is he's skewing the testimony. She also has the right not to get up there and tell her side of the story. Now, he's forcing me to put her in—

THE COURT: The questions that involve whether or not [Redulla] made statements about why she might have been late or whether she was blocked by police officers there, that's not critical to the case.

[REDULLA'S COUNSEL]: I think it goes to credibility, Your Honor.

THE COURT: It could be an innocuous reason why anyone wold [sic] mention that. I mean, it's not destructive to the defense, it does not impact her right to testify or not testify.

As to the hearsay exception in this case, the prosecution points out this is a hearsay exception as against a party[-]opponent, so I'll allow the question.

(Bench conference concluded.)

Q. (By [DEPUTY PROSECUTOR]) As you're at the McCully Shopping Center and [Redulla] gets there, [Redulla] doesn't tell you that she was delayed because the police came?

A. No, the first time we heard about the police was I think in the TRO, about the police or something like that, we read it.

Q. So [Redulla] doesn't tell you anything about she can't get out because [Kodama's] car is stopped there and she can't even back her car out, can't get out of that lane; she didn't tell you anything like that?

A. No. I don't know if his car was blocking her car.

Q. She doesn't tell you that the police come [sic]?

A. No, she said they weren't—when we read it, I said there were police and she said no.

Redulla argues that the circuit court should not have allowed the foregoing line of questioning because testimony by Leao about what she had been told by Redulla constituted hearsay and violated Redulla's right to remain silent.

Hawaii Rules of Evidence (HRE) Rule 803(a)(1)(A) sets out the applicable exception to the rule prohibiting hearsay:

**Rule 803 Hearsay exceptions; availability of declarant immaterial.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(a) Admissions.

(1) Admission by party-opponent. A statement that is offered against a party and is (A) the party's own statement, in either the party's individual or a representative capacity, or (B) a statement of which the party has manifested the party's adoption or belief in its truth.

HRE Rule 803(a)(1)(A).

██ Since Redulla's comments to Leao were being offered against Redulla, the comments were covered by the plain language of the "[a]dmission by party-opponent" exception to the hearsay rule. Redulla's claims that Leao's testimony violated Redulla's right to remain silent similarly have no merit. A defendant cannot prevent a witness from tes-

tifying as to what the witness heard the defendant say simply because such testimony might force the defendant to take the stand to explain those statements. Redulla's own appellate brief concedes that Redulla's statements are admissible against Redulla:

> Whether coerced or not, the extra-judicial statements of co-defendants made subsequent to the commission of the crime are hearsay and therefore inadmissible except against the person making the statement. *State v. Wakinekona,* 53 Haw. 574, 576, fn. 1, 499 P.2d 678 (1972) citing *State v. Hashimoto,* 46 Haw. 183, 377 P.2d 728 (1962); *Territory v. Kitabayashi,* 41 Haw. 428 (1956); *The King v. Marks,* 1 Haw. 81 (1851).

(Internal quotation marks omitted.)

While an extra-judicial statement made by Redulla would be inadmissible against Leao, that was not a concern here. Neither Leao nor her attorney objected to this line of questioning [12] and none of Redulla's alleged statements conflicted with Leao's own version of events (i.e., that Leao ran away as soon as she could free herself from Hill).

The circuit court thus did not err in allowing Leao's testimony to be used against Redulla.

### D. *The Evidence That Hill Was at One Time Leao's Pimp*

■ The circuit court refused to allow Leao to present evidence that would have allegedly shown that Hill had forced Leao to prostitute herself in the past. Leao argues that this was prejudicially erroneous:

> [W]ithout evidence of the pimp/prostitute relationship the jury does not know the true reality of the parties' relationship. Without knowledge of the pimp/prostitute relationship, Leao's terror in reaction to Hill's reappearance on the streets of Waikiki seems unreasonable and inexplicable.
>
> Without letting the jury hear evidence of their prior relationship, Hill is able to portray himself as a Navy veteran whose only interest is having a relationship with Leao is [sic] for the sake of [Daughter]. Leao then appears as a selfish and unreasonable

mother who is keeping a father away from his beloved daughter. When the true relationship is revealed, the jury is able to understand that Leao was in fear of not only returning to the ultimate abusive relationship but is fearful of losing [Daughter] to [Leao's] abuser.

Leao's argument may have had merit if Leao or Redulla had testified at trial that they had assaulted Hill in self-defense or with some other justification. Instead, they claimed to have had nothing to do with Hill's injuries. Therefore, the circuit court did not abuse its discretion when it decided that "the prejudicial value" of the evidence of the pimp/prostitute relationship "substantially outweigh[ed] the probative value."

### E. *Dr. Rosenfeld's Testimony About the Possible Effects of Hill's Wounds*

One of the lacerations Hill sustained was on his abdomen, slightly below the belt line. At trial, Dr. Rosenfeld was asked to speculate about what might have happened had Hill been subjected to the same injury in a nearby, and very sensitive, part of his anatomy:

> Q. [(By DEPUTY PROSECUTOR)] Now, [Dr. Rosenfeld], let me—did you, before I go into the next step of this way, if an individual—well, let me rephrase that, the area below the belt line, you didn't observe any injuries, you've indicated, but the area before the below[-]the[-]belt line, specifically the area surrounding where a person might wear their boxer shorts, the front area of that, are there any organs in that area? I know that sounds like, perhaps, a crazy question, but are there any—are there any—well, does a person—does a male, in this case Mr. Hill, would he have had any areas that might be exposed to injury by some kind of penetration of his boxer shorts?
>
> A. Certainly, both external and internal.
>
> Q. Now, with respect to those areas, that would include his penis?
>
> A. Correct.

---

12. Leao also did not raise this issue in her appellate brief.

Q. With respect to that, Mr. Hill did not—did not say he had any injury to that area, is that correct?

A. That's correct.

Q. However, had an instrument consistent with the type of instrument you saw causing the injuries to his arms as well as his chest and abdomen area ["any sharp implement with a sharp edge"], would an instrument like that have been able to cause injury to his penis?

[REDULLA'S COUNSEL]: Your Honor, I'm going to object, this is way out there and it's asking him to speculate on facts which are not even relevant to this case.

THE COURT: Objection is sustained, just rephrase your question.

Q. (By [DEPUTY PROSECUTOR]) Well, let me ask you this, [Dr. Rosenfeld], a laceration to the penis, would you—what type of injury or what type of problems might that cause?

[REDULLA'S COUNSEL]: Your Honor, I'm going to object, there's no relevance.

[DEPUTY PROSECUTOR]: Your Honor, there is high relevance as the [c]ourt may have heard in our pretrial discussions.

THE COURT: Objection overruled. You may answer the question.

[DR. ROSENFELD]: Of course it would depend upon the extent of damage to the genital organ. If there was significant enough damage and the laceration was through and through it would be described—it would be loss of the penis. It could be anything from that to anything less than that.

Q. (By [DEPUTY PROSECUTOR]) Is there a lot of blood that collects in that particular area or not?

A. Certainly there can be.

Q. And could a person if lacerated in that area lose significant amounts of blood?

A. Yes.

Q. And would that be life threatening?

A. Could be.

Q. With respect to the injuries that you observed, actual injuries that you observed

with respect to Mr. Hill, did you—were you ever concerned or were you concerned about a loss of blood?

A. Based upon my examination and vital signs and my clinical assessment was not [sic].

The deputy prosecutor went on to ask, without any further objection from the defense, whether any of Hill's injuries could have led to significant loss of blood:

Q. The areas, however, that were penetrated by whatever caused those injuries, could they have caused a loss—a significant loss of blood that might have concerned you?

A. Had major arteries been involved, absolutely.

Q. With respect to the areas that were—that you observed, are there any major arteries in any of those areas?

A. There are in those areas.

Q. Okay. None of them with respect to Mr. Hill was damaged, is that correct?

A. That's correct.

Q. Nonetheless, had they been damaged, it could have been very serious for him?

A. Definitely.

Q. Could that have caused loss of life with respect to Mr. Hill?

A. Yes.

 Leao argues that Dr. Rosenfeld's speculations as to what could have happened had Hill sustained a cut on his penis or an artery were irrelevant and "highly inflammatory."

 HRE Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." On appeal, "the question of whether evidence is relevant under HRE Rule 401 is reviewed under the right/wrong standard." *State v. Toro,* 77 Hawai'i 340, 347, 884 P.2d 403, 410 (App. 1994).

*State v. Malufau,* 80 Hawai'i 126, 906 P.2d 612 (1995) is the primary Hawai'i case deal-

ing with the relevance of medical testimony in an assault case. In *Malufau,* the defendant was convicted of Assault in the First Degree. *Malufau,* 80 Hawai'i at 128, 906 P.2d at 614. The primary evidence that the victim's injuries were "serious" was testimony by the attending doctor about what might have happened had the victim not received medical attention. *Id.* On appeal, the supreme court held that such testimony was not relevant and should not have been admitted:

> Hence, in order to convict Malufau of assault in the first degree, the prosecution was required to prove beyond a reasonable doubt that "serious bodily injury" to Mountford actually resulted from Malufau's conduct. "Serious bodily injury" is defined in HRS § 707–700 as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."
>
> In the instant case, the prosecution sought to prove that Malufau inflicted an injury that caused "serious, permanent disfigurement." The question thus becomes whether expert medical testimony regarding what the severity of the injury would have been absent medical attention is relevant to whether an injury actually caused "serious, permanent disfigurement." Based on our conclusion that proof that a result would have occurred but did not because of intervening events is irrelevant when that result is an element of the offense, we hold that such expert medical testimony is not relevant to prove "serious, permanent disfigurement."
>
> Thus, we hold that the circuit court erred in admitting Dr. Walczak's testimony regarding what the severity of Mountford's injuries would have been if Mountford had not received medical attention because the testimony was irrelevant to the charged offense under HRE Rule 401 and, thus, inadmissible to prove the element of serious bodily injury under HRE Rule 402.

*Id.* at 130, 906 P.2d at 616 (footnote omitted). In a footnote to the above passage, the supreme court explained that such testimony might be relevant in attempt cases or as evidence of a "substantial risk of death":

> This is not to say that all expert medical testimony is irrelevant in proving that an injury caused "serious, permanent disfigurement." For example, expert medical testimony would certainly be relevant to describe the actual disfigurement and to establish that it was permanent. Similarly, when the prosecution seeks to prove that an injury caused "protracted loss or impairment of the function of any bodily member or organ," expert medical testimony will be relevant to prove the "loss or impairment" and establish that it was "protracted."
>
> *Furthermore, when the prosecution seeks to prove that an injury "created a substantial risk of death," expert medical testimony regarding the risk of death that the defendant's actions created would clearly be relevant. In this context, evidence regarding what the severity of the injuries would have been absent medical attention is relevant, but only to the extent that it relates to the risk of death that the defendant's actions created.*
>
> *Finally, we recognize that expert medical testimony regarding what the severity of a person's injuries would have been absent medical attention could be relevant to prove that a defendant committed the offense of attempted assault in the first degree by "intentionally engag[ing] in conduct which was a substantial step in a course of conduct intended or known to cause" serious bodily injury.* See HRS §§ 705–500(2) (1993), 707–710(1). We further note that when such evidence is admitted to prove that a defendant committed the offense of attempted assault in the first degree, the defendant will be entitled to a limiting instruction, *see* HRE Rule 105, to ensure that the jury understands that the evidence cannot be used to establish that "serious, permanent disfigurement" actually occurred. *In the instant case, however, because the jury was not instructed on the included offense of attempted assault in the first degree, Dr. Walczak's testimony was not relevant to any issue before the jury.*

*Id.* at 130 n. 6, 906 P.2d at 616 n. 6 (emphases added, internal brackets omitted).

Defendants in this case were charged with Attempted Assault in the First Degree, so Dr. Rosenfeld's testimony would have been relevant if it tended to prove that the injuries sustained by Hill, absent medical attention, could have either "created a substantial risk of death" or led to "serious bodily injury" to Hill. The deputy prosecutor's questioning of Dr. Rosenfeld was aimed at getting Dr. Rosenfeld to speculate about the seriousness of the injuries Hill could have suffered (i.e., loss of life and penis) if Hill's penis had been cut by Defendants. Since the most serious wound sustained by Hill was to his finger and Dr. Rosenfeld testified that the wound to Hill's abdomen was "superficial," we conclude, applying *Malufau*, that Dr. Rosenfeld's speculative testimony regarding Hill's loss of life and penis was irrelevant. Therefore, the circuit court wrongly admitted such testimony over Leao's objection.

## CONCLUSION

In light of the foregoing discussion, we vacate the judgments convicting and sentencing Defendants for Attempted Assault in the Second Degree and remand for a new trial consistent with this opinion.